BRYAN TELEGIN, OSB # 105253
Bricklin & Newman, LLP
1001 4th Ave., Ste. 3303
Seattle, WA 98154
Tel: (206) 264-8600
Fax: (206) 264-9300
Email: telegin@bnd-law.com

ALLISON LaPLANTE, OSB # 023614
Earthrise Law Center
10015 SW Terwilliger Blvd.
Portland, OR 97219
Tel: (503) 768-6894
Fax: (503) 768-6642
Email: laplante@lclark.edu

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| NORTHWEST ENVIRONMENTAL ADVOCATES, an Oregon non-profit corporation,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, a United States Government Agency,<br><br>Defendant,<br><br>and<br><br>STATE OF OREGON; OREGON WATER | Civil No.: 3:12-cv-01751-AC<br><br>**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON CLEAN WATER ACT AND ENDANGERD SPECIES ACT CLAIMS**<br><br>(Oral Argument Requested) |

QUALITY STANDARDS GROUP; and THE
FRESHWATER TRUST,

                    Intervenors-Defendants.

_____

## **MOTION FOR SUMMARY JUDGMENT**

Pursuant to Local Rule 7-1, counsel for plaintiff Northwest Environmental Advocates

("NWEA") certify that they have conferred with counsel for the defendant, United States

Environmental Protection Agency ("EPA"), and with counsel for intervenor-defendants State of

Oregon, Oregon Water Quality Standards Group ("OWQSG"), and The Freshwater Trust.

Counsel indicated that EPA, the State of Oregon, and OWQSG will oppose this motion. The

Freshwater Trust plans to oppose this motion except with respect to NWEA's claims relating to

Oregon's proposed Klamath Basin temperature TMDL and the Willamette Basin mercury

TMDL.

For the reasons discussed in the following memorandum, NWEA respectfully requests

summary judgment on its first through ninth claims for relief, as alleged in its Second Amended

Complaint (Dkt. 11). After this Court's ruling on liability, NWEA requests the parties meet and

confer and propose a briefing schedule for issues pertaining to remedies.

<u>MEMORANDUM IN SUPPORT</u>

**TABLE OF CONTENTS**

<u>Page</u>

I.    INTRODUCTION ...................................................................................................1

II.   LEGAL BACKGROUND ......................................................................................2

      A.    Overview of the Clean Water Act .............................................................2

      B.    Overview of the Endangered Species Act.................................................4

III.  FACTUAL AND PROCEDURAL BACKGROUND .............................................6

      A.    Oregon's 2004 Water Quality Standards Revisions for Temperature ....................6

      B.    Prior Litigation over Oregon's 2004 Water Quality Standards Revisions ..............7

      C.    The Approved Temperature TMDLs.........................................................7

      D.    The Klamath Basin Temperature TMDL ................................................11

      E.    The Willamette Basin Mercury TMDL....................................................11

IV.   STANDARDS OF REVIEW ...............................................................................13

V.    ARGUMENT ......................................................................................................14

      A.    NWEA Has Standing to Sue on Behalf of Its Members. .......................14

      B.    EPA Violated CWA Sections 303(c) and 303(d) when It Approved the Temperature TMDLs.........................................................................................14

            1.    EPA Failed to Act under CWA Section 303(c) on the Superseding Criteria in the Temperature TMDLs. ........................................................15

            2.    EPA Acted Arbitrarily and Capriciously by Approving Temperature TMDLs that Do Not Implement "Applicable" Standards..........................17

            3.    EPA Acted Arbitrarily and Capriciously by Approving TMDLs that Do Not Contain Adequate Margins of Safety. ...........................................18

      C.    The Temperature TMDLs Fail to Implement *All* Applicable Standards. ..............21

D.    EPA's Approvals of the Temperature TMDLs Violated the ESA...........................24

      1.    For the Majority of Oregon's Temperature TMDLs, EPA Failed to Comply with Any of the Procedural Requirements of ESA Section 7...........................................................................................................................25

      2.    EPA Failed to Determine whether the New Natural Condition Criteria in the Willamette Temperature TMDL "May Affect" Listed Species. ..........................................................................................27

E.    EPA Violated Section 303(d) of the CWA by Failing to Approve or Reject the Klamath Basin Temperature TMDL within 30 Days of Submission. ...................28

F.    EPA's Approval of the Willamette Basin Mercury TMDL was Arbitrary and Capricious. ........................................................................................................29

      1.    The Mercury TMDL Does Not Implement Water Quality Standards for the Protection of Wildlife. ...................................................................29

      2.    The Mercury TMDL Is Not Set at a Level to Attain Water Quality Standards...........................................................................................31

      3.    The Mercury TMDL Does Not Contain Seasonal Variations. ..................33

      4.    The Mercury TMDL Lacks Individual Wasteload Allocations.................33

      5.    The Mercury TMDL Does Not Establish a "Daily" Load. ........................34

VI.    CONCLUSION.................................................................................................35

# TABLE OF AUTHORITIES

<u>Cases</u>                                                                                    <u>Page</u>

*Alaska Clean Water Alliance v. Clarke*, 1997 WL 446499 (W.D. Wash. 1997) ...........................17

*Am. Farm Bureau Fed'n v. United States Envtl. Prot. Agency*, 984 F.Supp.2d 289
(M.D. Pa. 2013) ...................................................................................................................33

*Anacostia Riverkeeper, Inc. v. Jackson*, 798 F.Supp.2d 210 (D.D.C. 2011) ........................ *passim*

*Arkansas v. Oklahoma*, 503 U.S. 91 (1992)..........................................................................3

*Cal. ex rel. Lockyer v. U.S. Dep't of Agric.*, 575 F.3d. 999 (9th Cir. 2009) .....................................5

*Dioxin/Organochlorine Ctr. v. Clarke*, 57 F.3d 1517 (9th Cir. 1995)..........................................26

*Envtl. Def. Fund, Inc. v. Costle*, 657 F.2d 275 (D.C. Cir. 1981) .................................................21

*Fla. Pub. Research Group Citizen Lobby, Inc. v. U.S. Envtl. Prot. Agency*
(*"FPIRG"*), 386 F.3d 1070 (11th Cir. 2004) .......................................................................15, 16

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167 (2000) ....................................14

*Friends of the Earth, Inc. v. U.S. Envtl. Prot. Agency*, 446 F.3d 140 (D.C. Cir.
2006) ..................................................................................................................................34

*Friends of the Wild Swan, Inc. v. U.S. Envtl. Prot. Agency*, Civil Action No. 99-
CV-00087, Dckt. No. 52, (May 23, 2000) .............................................................................26

*Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006 (9th Cir. 2012)............................. *passim*

*Miccosukee Tribe of Indians of Fla. v. U.S. Envtl. Prot. Agency ("FPIRG")*, 105
F. 3d 599 (11th Cir. 1997) ....................................................................................................16

*Minn. Ctr. for Envt'l Advocacy v. United States Envt'l Prot. Agency*, 2005 WL
1490331 (D. Minn. June 23, 2005)........................................................................................32

*Nat. Resources Def. Council, Inc. v. Fox*, 93 F.Supp.2d 531 (S.D. N.Y. 2000) .............................28

*Nw. Envtl. Advocates v. U.S. Envtl. Prot. Agency*, 268 F.Supp.2d 1255 (D. Or.
2003) ("*NWEA I*")...........................................................................................................1, 13, 15

*Nw. Envtl. Advocates v. U.S. Envtl. Prot. Agency*, 855 F.Supp.2d 1199 (D. Or.
2012) ("*NWEA II*"). .........................................................................................................*Passim*

*Or. Natural Res. Council v. Allen,* 476 F.3d 1031 (9th Cir. 2007) ................................................5

*Pronsolino v. Nastri*, 291 F.2d 1123 (9th Cir. 2002) ............................................................4

*PUD No. 1 of Jefferson County v. Wash. Dep't of Ecology*, 511 U.S. 700 (1994).......................22

*Sierra Club v. U.S. Envtl. Prot. Agency*, 162 F.Supp.2d 406 (D. Md. 2001) ..............................26

*Tenn. Valley Auth. v. Hill*, 437 U.S. 153 (1978) ...............................................................5

*Thomas v. Peterson*, 753 F.2d 754 (9th Cir. 1985)...............................................6, 13, 27

*W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472 (9th Cir. 2011) ...............................4, 24


<u>Statutes</u>                                                                        <u>Page</u>

5 U.S.C. § 702 ..................................................................................................17

5 U.S.C. § 706(2)(A) ...................................................................................... *passim*

16 U.S.C. §1531(b) ............................................................................................4

16 U.S.C. § 1536(a)(2) ....................................................................................5, 24

16 U.S.C. § 1536(b)(3)(A) ..................................................................................5

16 U.S.C. § 1540(g)(1)(A) .................................................................................13

33 U.S.C. § 1251(a) ...........................................................................................2

33 U.S.C. § 1311(b)(1)(C) ..................................................................................3

33 U.S.C. § 1313(a) ...........................................................................................2

33 U.S.C. § 1313(c) ............................................................................................7

33 U.S.C. § 1313(c)(1)........................................................................................3

33 U.S.C. § 1313(c)(2)(A) ................................................................................2, 3

33 U.S.C. § 1313(c)(3)........................................................................................3

33 U.S.C. § 1313(c)(4)........................................................................................3

33 U.S.C. § 1313(d)............................................................................................3

33 U.S.C. § 1313(d)(1)(A) ..................................................................................................3, 21

33 U.S.C. § 1313(d)(1)(C) ................................................................................................ *passim*

33 U.S.C. § 1313(d)(2) ..............................................................................................4, 25, 28

33 U.S.C. § 1341(a)(1) ....................................................................................................3

33 U.S.C. § 1342 ...........................................................................................................3

33 U.S.C. § 1344(p) .......................................................................................................3

33 U.S.C. § 1365 ...........................................................................................................28

33 U.S.C. § 1365(a)(2) ...............................................................................................13, 15


Regulations                                                                                  Page

40 C.F.R. § 122.44(d)(1)(vii)(B) ...................................................................................33

40 C.F.R. § 130.0(b) ......................................................................................................3

40 C.F.R. § 130.2(f) ...................................................................................................4, 18

40 C.F.R. § 130.2(g) ......................................................................................................4

40 C.F.R. § 130.2(h) ..................................................................................................4, 33

40 C.F.R. § 130.2(i) ...................................................................................................4, 18

40 C.F.R. § 131.3(b) .................................................................................................15, 16

40 C.F.R. § 131.3(i) .......................................................................................................3

40 C.F.R. § 131.5(a)(1) ...................................................................................................3

40 C.F.R. § 131.5(a)(2) ...............................................................................................3, 16

40 C.F.R. § 131.6 ...........................................................................................................3

40 C.F.R. § 131.10(a) ....................................................................................................21

40 C.F.R. § 131.11(a) .................................................................................................16, 20

40 C.F.R. §131.20 ..................................................................................................3

40 C.F.R. § 131.21 .................................................................................................3

40 C.F.R. § 131.21(a)(2) ........................................................................................3

40 C.F.R. § 131.21(c)........................................................................................3, 17

40 C.F.R. § 131.21(d)...............................................................................3, 17, 18

40 C.F.R. § 131.21(e)............................................................................................17

40 C.F.R. § 131.22 ..................................................................................................3

50 C.F.R. § 402.14(a)........................................................................................5, 24

50 C.F.R. § 402.14(b)(1)....................................................................................5, 24


State Statutes and Regulations                                               Page

OAR 340-041-0002(4).......................................................................................7, 16

OAR 340-041-0002(41).....................................................................................9, 20

OAR 340-041-0028(4)(a) ......................................................................................23

OAR 340-041-0028(4)(a-f).....................................................................................6

OAR 340-041-0028(4)(d)......................................................................................22

OAR 340-041-0028(8).............................................................................................6

OAR 340-041-0033, Table 40 ..............................................................................12

OAR 340-041-0033(2)...........................................................................................30

OAR 340-041-0121(1)...........................................................................................22

OAR 340-041-0151(1)...........................................................................................22

OAR 340-041-0170(1)...........................................................................................22

OAR 340-041-0201(1)...........................................................................................22

OAR 340-041-0271(1) ..................................................................................22

OAR 340-041-0286(1) ..................................................................................22

OAR 340-041-0310(1) ..................................................................................22

OAR 340-041-0320(1) ..................................................................................22

OAR 340-041-0340 ................................................................................22, 30

OAR 340-041-0340(1) ..................................................................................30

<u>Court Rules</u>                                                                                <u>Page</u>

Fed. R. Civ. P. 56(a) ....................................................................................13

<u>Other Authorities</u>                                                                         <u>Page</u>

EPA,Technical Support Document for Action on the State of Oregon's New and
Revised Human Health Water Quality Criteria for Toxics and Revisions to
Narrative Toxics Provisions, Submitted on July 8, 2004 (June 1, 2010), *available
at* http://www.epa.gov/region10/pdf/water/oregon-hhwqc-tsd_june2010.pdf ............................12

## GLOSSARY

| | |
|---|---|
| APA | Administrative Procedure Act |
| AR | Administrative Record |
| C | Celsius |
| CWA | Clean Water Act |
| EPA | United States Environmental Protection Agency |
| ESA | Endangered Species Act |
| F | Fahrenheit |
| LA | Load Allocation |
| LC | Loading Capacity |
| MOS | Margin of Safety |
| NCC | Natural Conditions Criterion |
| NWEA | Northwest Environmental Advocates |
| OAR | Oregon Administrative Rules |
| TMDL | Total Maximum Daily Load |
| WLA | Wasteload Allocation |

## I.    INTRODUCTION

"Water temperature is a critical aspect of the freshwater habitat of Pacific Northwest salmonids. Those salmonids listed as threatened and endangered under the ESA and other cold water salmonids need cold water to survive."[1] For decades, Oregon's imperiled salmon, steelhead, and bull trout have not had the cold water they need, and their numbers have plummeted dramatically.[2] This is the third in a line of lawsuits by Northwest Environmental Advocates ("NWEA") to force the United States Environmental Protection Agency ("EPA") to protect Oregon's cold-water salmonids.

The first two cases resulted in the vacatur of major provisions of Oregon's water quality standards for temperature.[3] In *NWEA II*, this Court set aside EPA's approval of Oregon's Natural Conditions Criterion (the "NCC"), which authorized Oregon to make future, sweeping changes to its temperature standards without submitting them to EPA for review as required by Section 303(c) of the Clean Water Act ("CWA"). *See* 855 F.Supp.2d at 1217–18. Now, NWEA challenges the illegal fruits of the NCC—EPA's approval of 14 Total Maximum Daily Loads ("TMDLs") in which Oregon erased its existing temperature standards and replaced them with new, less

---

[1] AR0462 at 2820 (EPA Region 10 Guidance for Pacific Northwest State and Tribal Temperature Water Quality Standards). Citations to the administrative record include the document number ("AR"), followed by the Bates range where prefixes and leading zeros are omitted (e.g., "EPA002820" becomes "2820").

[2] *See, e.g.,* AR0466 at 25839–49, 25850–53 (concluding the status of Oregon's threatened and endangered salmon and steelhead, "is such that there must be a significant improvements [sic] in the environmental conditions they experience . . . to meet the biological requirements for survival and recovery of these species.").

[3] *See Nw. Envtl. Advocates v. U.S. Envtl. Prot. Agency*, 268 F.Supp.2d 1255 (D. Or. 2003) ("*NWEA I*"); *Nw. Envtl. Advocates v. U.S. Envtl. Prot. Agency*, 855 F.Supp.2d 1199 (D. Or. 2012) ("*NWEA II*").

protective standards purportedly reflecting "natural" conditions.[4] By approving the TMDLs, EPA circumvented its duty under CWA Section 303(c) to review all new or revised water quality standards. It acted arbitrarily and capriciously by approving TMDLs that are not protective of cold-water salmonids.  And it breached its duty to review the TMDLs under the Endangered Species Act ("ESA"). This case aims to ensure this Court's earlier rulings result in meaningful on-the-ground improvements for the temperatures of Oregon's waters and the survival of imperiled species that depend on them.

This case also challenges EPA's approval of Oregon's Willamette basin mercury TMDL, which violates nearly every requirement for a valid TMDL, and EPA's four-year failure to act on Oregon's proposed temperature TMDL for the Klamath basin.

## II.    LEGAL BACKGROUND

A.    Overview of the Clean Water Act

The purpose of the CWA is to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). The CWA also establishes an "interim goal of water quality which provides for the protection and propagation of fish, shellfish, and wildlife." *Id*. To both ends, the Act requires states to develop water quality standards that establish, and then protect, the desired conditions of its waterbodies. *Id.* § 1313(a). Water quality standards designate desired "uses" for the waters, as well as numeric and narrative "criteria" to protect the uses. *Id.* § 1313(c)(2)(A). Together, the designated uses and criteria, along with an antidegradation policy, constitute water quality standards. *Id.*; 40 C.F.R. §§

---

[4]  The 14 TMDLs at issue in this case are listed in Table 3 of the Second Amended Complaint (Nov. 28, 2011), Dkt. 11 at 21–22. Two TMDLs—for the Rogue's Applegate subbasin and the Snake River— were written to a natural conditions criterion that predated the NCC. *See* AR0005 at 55, AR0034 at 818. Because all of the TMDLs raise the same legal issues, the Applegate and Snake River TMDLs are included in this lawsuit.

131.3(i), 131.6. Water quality standards "provide the legal basis for control decisions under the Act." 40 C.F.R. § 130.0(b). Achieving them is one of the Act's "central objectives." *Arkansas v. Oklahoma*, 503 U.S. 91, 106 (1992).

Establishing water quality standards is a two-step process. First, a state adopts water quality standards and submits them to EPA. 33 U.S.C. § 1313(c)(1–2(A)); 40 C.F.R. §§ 131.6, 131.20. Second, EPA must approve or disapprove the standards. 33 U.S.C. § 1313(c)(3); 40 C.F.R. § 131.21. In doing so, EPA must determine whether the designated uses are appropriate and the criteria are adequate to protect those uses. 40 C.F.R. § 131.5(a)(1–2). If EPA approves the standards, they become "applicable" for purposes of the CWA, *see* 40 C.F.R. § 131.21(c), (d), and are "part of the federal law of water pollution control," *Arkansas*, 503 U.S. at 109. If EPA disapproves the standards, and the state fails to improve them, EPA must promulgate replacement standards. 33 U.S.C. § 1313(c)(3–4); 40 C.F.R. §§ 131.21(a)(2), 131.22.

Once approved by EPA, water quality standards serve two primary roles under the CWA. First, they are the regulatory basis for NPDES permits and other regulatory approvals for the "discharge" of pollutants. 33 U.S.C. §§ 1311(b)(1)(C), 1342, 1344(p), 1341(a)(1). Second, EPA-approved water quality standards are the regulatory basis of the TMDL program under CWA Section 303(d), 33 U.S.C. § 1313(d), the purpose of which is to clean up waterbodies that fail to achieve water quality standards. *Id.*

In broad terms, Section 303(d) requires states to identify waters that fail to meet applicable standards. *Id.* § 1313(d)(1)(A). For each of these "impaired" waters, the state must develop a TMDL "to implement the applicable water quality standards with seasonal variations and a margin of safety which takes into account any lack of knowledge concerning the relationship between effluent limitations and water quality." *Id.* § 1313(d)(1)(C).

A TMDL represents the total amount of pollution that can enter a waterbody, on a daily basis, while still meeting applicable standards; this is also known as "loading capacity." *Id*; 40 C.F.R. § 130.2(f). Like cutting slices of a pie, portions of the loading capacity are then "allocated" between pollution sources. 40 C.F.R. § 130.2(i). Portions allocated to point sources are called wasteload allocations ("WLAs"). *Id.* § 130.2(h). Portions allocated to "nonpoint" sources—such as runoff from logging and farming—are load allocations ("LAs"). *Id.* § 130.2(g). Thus, the TMDL is the "sum of the individual WLAs for point sources and LAs for nonpoint sources and natural background*." Id.* § 130.2(i). TMDLs serve the goal of restoring waterbodies by identifying, and then allocating, the total amount of allowable pollution. *See Pronsolino v. Nastri*, 291 F.3d 1123, 1126, 1128 (9th Cir. 2002). When allocations are met, water quality standards will be attained. *Id.* at 1129.

Like water quality standards, states must submit TMDLs to EPA for approval. 33 U.S.C. § 1313(d)(2). If EPA approves a TMDL, the state must incorporate it into its "continuing planning process." *Id*. If EPA disapproves a TMDL, EPA must establish a replacement TMDL. *Id.* EPA must act on proposed TMDLs "not later than thirty days after the date of submission." *Id.*

B.    Overview of the Endangered Species Act

The ESA seeks to "provide a program for the conservation of . . . endangered species and threatened species," as well as "a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved." 16 U.S.C. §1531(b). ESA Section 7(a)(2)— the "heart" of the ESA[5]—requires each federal agency to ensure that its activities are not likely to jeopardize the continued existence of threatened or endangered species, or result in the

---

[5] *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 495 (9th Cir. 2011).

destruction or adverse modification of designated critical habitat. 16 U.S.C. § 1536(a)(2). "The

plain intent of Congress in enacting [the ESA] was to halt and reverse the trend toward species

extinction, whatever the cost." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 184 (1978).

To avoid jeopardizing listed species or destroying or adversely modifying critical habitat,

Section 7 establishes an interagency consultation process under which "[e]ach Federal agency

shall review its actions at the earliest possible time to determine whether any action may affect

listed species or critical habitat." 50 C.F.R. § 402.14(a). If an action "may affect" a listed species,

then the agency must engage in formal consultation with the United States Fish and Wildlife

Service or National Marine Fisheries Service (collectively, "the Services"). *Id.*; *Or. Natural Res.

Council v. Allen,* 476 F.3d 1031, 1033 (9th Cir. 2007). The result of formal consultation is a

"biological opinion" issued by the Services on the likelihood of jeopardy and/or destruction or

adverse modification of critical habitat. 16 U.S.C. § 1536(b)(3)(A).

To determine if consultation is needed, each federal agency must make a threshold

determination that the proposed action "may affect" listed species, or that it will have no effect.

50 C.F.R. § 402.14(a). An action "may affect" a listed species if it will have "*[a]ny possible

effect*, whether beneficial, benign, adverse or of an undetermined character." *Cal. ex rel. Lockyer

v. U.S. Dep't of Agric.*, 575 F.3d 999, 1018 (9th Cir. 2009) (emphasis in original), *quoting* 51

Fed. Reg. 19,926, 19,949 (June 3, 1986). Once a "may affect" determination is made, an agency

may avoid formal consultation only if the Services confirm, in writing, that the action "is not

likely to adversely affect" listed species. 50 C.F.R. § 402.14(b)(1). "Thus, actions that have any

chance of affecting listed species or critical habitat—even if it is later determined that the actions

are 'not likely' to do so—require at least some consultation under the ESA." *Karuk Tribe of Cal.

v. U.S. Forest Serv.*, 681 F.3d 1006, 1027 (9th Cir. 2012).

Compliance with Section 7 is critical. "If a project is allowed to proceed without substantial compliance with those procedural requirements, there can be no assurance that a violation of the ESA's substantive provisions will not result." *Thomas v. Peterson*, 753 F.2d 754, 764 (9th Cir. 1985).

## III.    FACTUAL AND PROCEDURAL BACKGROUND

A.    Oregon's 2004 Water Quality Standards Revisions for Temperature

In 2004, Oregon adopted major revisions to its water quality standards for temperature, including several new designated uses representing Oregon's salmon, steelhead, trout, and bull trout. Many of these species are threatened or endangered under the ESA.[6] Oregon also adopted detailed maps depicting where and when each designated use (and thus, each species) must be protected in Oregon's many rivers and streams. *See* Figures 130A to 340B, OAR Chapter 340, Division 41. The revisions also included new numeric temperature criteria to protect the uses, ranging from 12˚C–13˚C, for juvenile salmonids, to 16˚C–20˚C for adult and sub-adult salmonids. *See* OAR 340-041-0028(4)(a)–(f). EPA approved the revisions on March 2, 2004.

But the 2004 revisions also contained a sweeping exemption to the numeric criteria known as the Natural Conditions Criterion. Under the NCC, whenever the Oregon Department of Environmental Quality ("DEQ" or "Oregon") determined that water temperatures would exceed the numeric criteria under so-called "natural" conditions, DEQ's estimate of natural water temperatures—also called "natural thermal potential"—would supersede the numeric criteria and be "*deemed* to be the applicable temperature criteria" without EPA's review and approval. OAR 340-041-0028(8) (emphasis added). In this way, the NCC was an exemption to the plain language of CWA Section 303(c), which requires EPA to approve all new or revised water

---

[6] These species, and their ESA status, are set out in Table 2 of Plaintiff's Second Amended Complaint, Dkt. 11 at 18.

quality standards. 33 U.S.C. § 1313(c). Accordingly, the NCC allowed Oregon to alter its water

quality standards without any statutory check on how those changes might affect cold-water

salmonids.

B.    Prior Litigation over Oregon's 2004 Water Quality Standards Revisions

In 2005, NWEA filed suit in this Court challenging EPA's approval of the NCC. And on

February 28, 2012, this Court granted summary judgment in favor of NWEA and held, in no

uncertain terms, that the NCC violates the plain language of CWA Section 303(c):

> [T]he NCC supplants rather than supplements the numeric criteria by allowing
> Oregon to replace the numeric criteria (determined to be protective of salmonids)
> with a new numeric standard during the TMDL process. *The replacement of one
> numeric standard with another less-protective numeric standard cannot be viewed
> as "supplementing" the first standard. Accordingly, the court finds that the NCC
> violates the CWA's § 303(c) water quality standards review*.

*NWEA II*, 855 F.Supp.2d at 1217–18 (emphasis added), *citing Ohio Valley Envtl. Coal. v.

Horinko*, 279 F.Supp.2d 732, 764 (S.D. W. Va. 2003).

This Court further observed that Oregon's method of determining purportedly "natural"

conditions "is a process rife with uncertainty." *Id.* at 1218. And even if salmonids had thrived in

warmer conditions in the past, this Court held that Oregon (and EPA) cannot simply assume that

salmonids can tolerate warmer conditions today in light of their imperiled status and dramatic

changes in river conditions. *Id.* On April 10, 2013, this Court set aside EPA's approval of the

NCC. *See NWEA II* (Dkt. 370 at 2, ¶ A.1).

C.    The Approved Temperature TMDLs

When EPA approved the NCC, it understood that Oregon would use temperature TMDLs

to supplant Oregon's numeric temperature criteria with new natural condition criteria.[7] *NWEA II*,

---

[7] Reflecting Oregon's naming convention, we use the phrase "natural condition criteria" to refer
to the superseding criteria established pursuant to the NCC. *See* OAR 340-041-0002(4) (defining

855 F.Supp.2d at 1218. Prior to this Court's final order in *NWEA II*, EPA approved 14 TMDLs that wiped away the numeric criteria from whole basins, and replaced them with hotter, less protective criteria.

In the TMDLs, Oregon used models to estimate the natural thermal potential of key rivers (and infrequently, streams) in each basin. *See generally* AR 0457 at 22743–44. In many of the TMDLs, the new natural condition criteria were then reported in tables and graphs. Below is an example from the Umpqua TMDL, AR0182 at 11130. The graph depicts the disparity between the numeric standard (16˚C) and the new natural condition criteria represented in blue (DEQ's estimate of natural thermal potential).



The new natural condition criteria often greatly exceed the state's numeric criteria. Here, the Umpqua TMDL increased the temperature criteria from 16˚C–18˚C (60˚F–64˚F) to as high as 24.5˚C (76˚F), *see* AR0182 at 11119–43, and even a whopping 32.5˚C (90˚F) for the Olalla-

---

"applicable criteria" to mean, in part, "the superseding natural condition criteria as described in [the NCC]"). The phrase is used to refer both to Oregon's new numeric criteria generated pursuant to the NCC, and to the NCC's use as a mechanism to wipe away the existing numeric criteria without replacing them with new criteria, as discussed below.

Lookingglass Creek. *Id*. at 11124. The superseding natural condition criteria for the John Day River run as high as 27.5˚C (81.5˚F). AR0371 at 17827. And the superseding criteria for the Willamette mainstem are as high as 24˚C, *see* AR0121 at 6301–08, significantly higher than the temperature criterion EPA *disapproved* in 1999. *See* AR0469 at 25963.

NWEA has prepared a complete list of the highest superseding natural condition criteria, attached as Exhibit A to the Declaration of Bryan Telegin. Many of the new criteria are in the "lethal" range as reported by EPA. *Compare* Telegin Dec., Ex. A *with* AR0462 at 24839–40. Indeed, EPA found that at 32.5˚C, the highest new criterion generated by the NCC in the TMDLs, "[e]xposure of less than 10 seconds can cause instantaneous lethality." AR0462 at 24856.

In addition to wiping away the numeric criteria, the new natural condition criteria fail to represent truly "natural conditions" that "are not influenced by past or present anthropogenic activities." OAR 340-041-0002(41). "Oregon's modern waterbodies have undergone dramatic changes and are no longer the rivers they once were." *NWEA II*, 855 F.Supp.2d at 1218. These changes include dams, water withdrawals, channelization, widespread removal of riparian vegetation, loss of groundwater flows, and changes in the width-to-depth ratio of streams due to sedimentation, all of which have resulted in significant warming of Oregon's waterbodies. *See, e.g.,* AR0462 at 24829–30. But in modeling so-called "natural" conditions, Oregon did *not* account for many of these changes. As stated in the Walla Walla TMDL, the superseding criteria "[are] not an estimate of pre-settlement conditions." AR0086 at 4257 (emphasis in original). Likewise, Oregon's temperature guidance explains that "[a]ttempts at simulating historical

conditions cannot be validated and are likely inadequate on multiple counts." AR0457 at 22784.[8]

Thus, as this Court previously concluded, Oregon's natural condition criteria do not represent

historic conditions in which salmonids used to thrive. *See supra* at 2, 9.

In addition to determining new numeric criteria for *modeled* rivers and streams

(represented in the graphs and tables), the TMDLs also applied the NCC to *unmodeled* rivers and

streams. Although some TMDLs are ambiguous as to the geographic reach of the NCC, and

sometimes at odds with EPA's characterization of the TMDLs in its approval letters, it is clear

that, in each basin, Oregon used the NCC to erase the numeric criteria for vast numbers of rivers

and streams.[9] In short, even where Oregon has not estimated a waterbody's natural temperature,

---

[8] *See also, e.g.,* AR0182 at 11137 (Umpqua TMDL: model results do "not account for floodplain connectivity, large woody debris, channel complexity, and other factors that may be degraded due to settlement and development"); AR0115 at 5797 (Willamette TMDL, McKenzie Subbasin: model results do not account for loss of stream channel complexity, floodplain processes, and flow, and increased tributary temperature"); AR0373 at 18070 (John Day TMDL, App. B: in a "natural state," tributaries contribute cooler water to larger rivers but "no estimates of potential tributary temperatures were made"); AR0108 at 4913 (Willamette Basin Mainstem TMDL: model reflects current conditions relating to the Clackamas River Hydroelectric Project, tributary inflow temperatures, and river channel).

[9] *See* Rogue, Applegate: AR0005 at 55 (all perennial streams), AR0002 at 5 (NCC applies to all waters); Snake: AR0034 at 724 (all listed segments), AR0033 at 631-2 (NCC applies but has not been quantified); Sandy: AR0068 at 3763 (all perennial streams) at 3814-15 (NCC applies possibly throughout basin); Umatilla, Walla Walla: AR0085 at 4194 (all perennial streams), AR0082 at 4174 (NCC applies across the basin); Willamette: AR0108 at 4891 (all perennial and fish bearing intermittent streams), AR0099 at 4632 (NCC "applicable throughout the basin"); Umatilla, Willow Creek: AR0165 at 10472 (NCC applies to all streams that are perennial or have the natural potential to be); Umpqua: AR0182 at 11067 (NCC or numeric applies to all perennial or fish bearing streams); Rogue, Bear Creek: AR0218 at 12746 (NCC applies to all perennial or intermittent fish bearing streams); Molalla-Pudding: AR0247 at 13429 (all perennial and intermittent streams), at 13437 (NCC applies to Molalla and Pudding Rivers, unclear as to tributaries); Rogue: AR0283 at 14410 (all perennial and intermittent streams), *id*. at 14462 (NCC or numeric); Middle Columbia, Miles Creek: AR0309 at 15492 (all perennial and intermittent streams), *id*. at 15512 (NCC or numeric); Lower Grande Ronde: AR0322 at 15835 (NCC determined to apply to all perennial and intermittent streams); Malheur: AR0346 at 17018 (all perennial and intermittent streams), AR0346 at 17053 (NCC or numeric); John Day: AR0371 at 17822 (NCC applies to "stream network"), AR0373 at 18082 (NCC "invoked at basin scale"). *See also* AR0457 at 22782 (Oregon temperature guidance: "[I]f NTP is the applicable criterion

the NCC has wiped away the applicable numeric criteria.

Thus, Oregon erased its numeric temperature criteria—the very criteria EPA fought vigorously to defend in *NWEA II* as protective of salmonids, even though they were set at the upper end of the allowable range for the species—for every basin and subbasin covered by the TMDLs.  Despite this, and despite Oregon's inability to model the historic conditions under which salmonids thrived, EPA did not review the new superseding criteria in the TMDLs under CWA Section 303(c). Further, other than the Snake and Willamette Basins—for which EPA made "no effect" determinations—EPA did not evaluate the effect of the TMDLs under the ESA or consult with the Services as required by Section 7.

    D.      <u>The Klamath Basin Temperature TMDL</u>

On December 21, 2010, Oregon submitted a temperature TMDL for the Upper Klamath and Lost River Subbasins for EPA approval. *See* AR0398. Like the TMDLs above, the proposed Klamath TMDL is based on the NCC and would increase temperature criteria for Klamath Basin waterbodies. *See Id*. at 19533. To date, EPA has neither approved nor disapproved the TMDL.

    E.      <u>The Willamette Basin Mercury TMDL</u>

NWEA also challenges EPA's approval of Oregon's mercury TMDL for the Willamette Basin (the "Mercury TMDL"). *See* AR0107. Mercury is a neurotoxin that can have profoundly negative impacts on human health. *See generally* AR0154 at 3–4.[10] Mercury also "bioaccumulates" and is slow to leave the body, thus posing particularly high health risks for people and animals who eat contaminated fish. *Id*. at 1. For this same reason, mercury has

---

on the main stem, it may be inferred that the natural conditions criterion applies on perennial tributaries as well").

[10] AR0154 was omitted from the record because EPA was still searching for a copy when it compiled the record. The document is attached as Exhibit B to the declaration of Bryan Telegin. Because it is not Bates stamped, citations use the document's internal pagination.

negative effects on fish-eating wildlife:

> Deposition of mercury to waterbodies can also have an adverse impact on ecosystems and wildlife. Plant and aquatic life, as well as fish, birds, and mammalian wildlife, can be affected by mercury exposure. . . . Piscivorous avian and mammalian wildlife are exposed to mercury mainly through the consumption of contaminated fish and, as a result, accumulate mercury to levels greater than those in their prey.

*Id*. at 4.

The Mercury TMDL represents Oregon's first step toward calculating acceptable levels of mercury in waters of the Willamette Basin. But this purported TMDL is just that—*a tentative and preliminary step*. It does not identify pollution reductions necessary to attain water quality standards. It does not allocate WLAs and LAs to individual sources of pollution. It is nothing more than a preliminary, self-described "study." AR0107 at 4861.

Instead, Oregon's "goal" for the TMDL was simply to establish "an *interim* water column guidance value" to protect human health, based on its then-proposed methyl mercury criterion for fish tissue. AR0107 at 4850 (emphasis added). The Mercury TMDL established that interim guidance value at 0.92 nanograms per liter (ng/l), a concentration of mercury that might, if achieved, reduce methyl mercury in fish tissue such that fish in the Willamette basin would be safer to eat.[11] *See id*. at 4860–64. Recognizing the high degree of uncertainty in its interim guidance value, the TMDL candidly observes that there is only a "moderate" level of confidence that achieving the 0.92 ng/l target will result in fishable waters. *Id*. at 4865.

---

[11] We say "safer" (not "safe") because the TMDL's interim water-column guidance value of 0.92ng/l was calculated to achieve a fish-tissue concentration of 0.3 mg/kg, which Oregon previously submitted to EPA in 2004 as its proposed water quality criterion under CWA Section 303(c). *See* EPA, Technical Support Document for Action on the State of Oregon's New and Revised Human Health Water Quality Criteria for Toxics and Revisions to Narrative Toxics Provisions Submitted on July 8, 2004 (June 1, 2010) at 17-20, *available at* http://www.epa.gov /region10/pdf/water/oregon-hhwqc-tsd_june2010.pdf. EPA disapproved Oregon's proposed criterion on June 1, 2010, *see id.*, and Oregon's current mercury criterion—reflecting a more accurate estimate of human fish consumption—is much lower at 0.040 mg/kg. OAR 340-041-0033, Table 40.

To achieve the interim guidance value, the TMDL calculated a total annual loading capacity for the basin of 94.6 kilograms per year, *id.* at 4881, and divided this annual loading capacity into broad "interim" WLAs for two "source sector categories." *Id.* at 4882–84. No allocations were made to specific point sources. *See id*. at 4884.  Further, the TMDL states that these broad "category" load allocations will *not* be used to calculate NPDES permit limits for individual point sources.  *Id.* at 4850. Instead, they serve merely to "define the extent of the problem and to identify the level of effort needed to address the bioaccumulation of mercury in fish." *Id*. EPA approved the Mercury TMDL on September 29, 2006. *See* AR0098.

## IV.     STANDARDS OF REVIEW

Summary judgment is appropriate if there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).

NWEA's second and eighth claims for relief—addressed in Sections V.B.1 and V.E relating to EPA's failure to act on new natural condition criteria and the Klamath TMDL—arise under the CWA citizen suit provision, 33 U.S.C. § 1365(a)(2). Review is limited to determining whether EPA "failed to exercise a nondiscretionary duty." *NWEA I*, 268 F.Supp.2d at 1259.

NWEA's sixth and seventh claims for relief—addressed in Section V.D and relating to EPA's failure to act under the ESA on the temperature TMDLs—arise under the ESA citizen suit provision, which provides a cause of action to enjoin any person "in violation of any provision of [the ESA]." 16 U.S.C. § 1540(g)(1)(A). "A plaintiffs' burden in establishing a procedural violation [of the ESA] is to show that the circumstances triggering the procedural requirement exist, and that the required procedures have not been followed." *Thomas*, 753 F.2d at 765.

NWEA's claims pertaining to EPA's approval of the temperature and mercury TMDLs, addressed in Sections V.B.2, V.B.3, V.C, and V.F, are governed by the Administrative Procedure

Act ("APA"), under which a court must set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "An arbitrary and capricious finding is necessary if the agency 'relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation for its decision that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *NWEA II*, 855 F.Supp.2d at 1204, *quoting Lands Council v. McNair*, 629 F.3d 1070, 1074 (9th Cir. 2010).

## V.     ARGUMENT

### A.     NWEA Has Standing to Sue on Behalf of Its Members.

NWEA has standing to sue on behalf of its members who use Oregon's rivers and streams for recreation, fishing, wildlife viewing, and other uses, and who suffer injury from the water quality impairments afflicting those waters. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167 (2000). Facts supporting NWEA's standing appear in the materials cited herein and in the declarations of NWEA's members, submitted herewith and incorporated by reference herein.

### B.     EPA Violated CWA Sections 303(c) and 303(d) when It Approved the Temperature TMDLs.

The NCC allowed Oregon to conflate the CWA's TMDL process under Section 303(d) with the standards-making process under Section 303(c), resulting in TMDLs that set new, less protective natural condition criteria rather than attain existing numeric criteria. As this Court held in *NWEA II*, the NCC allowed Oregon to replace existing numeric criteria "with a new numeric standard during the TMDL process," thus "violat[ing] the CWA's § 303(c) water quality standards review." *NWEA II,* 855 F. Supp.2d at 1217–18. Oregon's own description of the NCC

is in accord with this Court's ruling.[12]

Three legal conclusions flow from EPA's approval of TMDLs that, by their express terms, establish new temperature criteria. First, EPA violated its nondiscretionary duty to act under Section 303(c) on new or revised temperature standards when Oregon established superseding natural condition criteria in the TMDLs. Second, EPA violated Section 303(d) by approving TMDLs that do not implement "applicable" standards, i.e. criteria that EPA had approved under Section 303(c). And third, the statutorily-required "margins of safety" in the TMDLs are invalid. For all of these reasons, this Court should reaffirm its holding in *NWEA II* and grant summary judgment to NWEA on its first, second, and fifth claims for relief.

1.    EPA Failed to Act under CWA Section 303(c) on the Superseding Criteria in the Temperature TMDLs.

The CWA's citizen suit provision authorizes any citizen to sue EPA for failure to perform "any act or duty under [the CWA] which is not discretionary with the Administrator." 33 U.S.C § 1365(a)(2). Under CWA Section 303(c), EPA has a nondiscretionary duty to review all new or revised water quality standards. *NWEA I*, 268 F.Supp.2d 1260.

EPA's duty to review new or revised standards extends to new "criteria" representing "a quality of water that supports a particular use." 40 C.F.R. § 131.3(b). It also extends to provisions of state law that "supplant or otherwise delay the implementation of" such criteria. *NWEA II*, 855 F.Supp.2d at 1211; *see also Fla. Pub. Research Group Citizen Lobby, Inc. v. U.S. Envtl. Prot. Agency* (*"FPIRG"*), 386 F.3d 1070, 1089 (11th Cir. 2004) (duty extends to provisions that have a "practical effect" on water quality standards). Finally, EPA must review new or revised standards even if the state does not formally submit them for 303(c) review. *Miccosukee Tribe of Indians of*

---

[12] *See, e.g.,* AR0457 at 22743 ("Where stream temperature is expected to exceed the numeric criteria under natural conditions, . . . the natural condition *becomes the criteria* for that water body or stream reach and supersedes the numeric criteria) (emphasis added).

*Fla. v. U.S. Envtl. Prot. Agency*, 105 F.3d 599, 602 (11th Cir. 1997). Otherwise, a state "could radically modify its water quality standards, simply disavow that a change had taken place, and the EPA could rely on [the state's] disavowal to avoid its mandatory review of the modified standards." *FPIRG*, 386 F.3d at 1089.

Because EPA had approved the NCC, which authorized the revision of temperature standards during the TMDL process, Oregon did not submit its new TMDL-generated natural condition criteria for 303(c) review. But Oregon stated repeatedly in its TMDLs that it was replacing the numeric criteria for hundreds of rivers and streams with new criteria. *See supra* Note 9. EPA was required to review the new criteria under Section 303(c), and to determine whether they protected designated uses, notwithstanding its prior, illegal approval of the NCC. *See* 40 C.F.R. § 131.11(a) (criteria must be based on "sound scientific rationale" and "support the most sensitive use"). The NCC cannot override the plain requirements of the CWA.

Not only did Oregon explicitly *say* that the TMDLs alter water quality standards, Oregon's new natural condition criteria clearly fall within the purview of Section 303(c). They are "criteria"; they specify a "quality of water." *See id.* § 131.3(b). And having been incorporated into TMDLs adopted by administrative order and approved by EPA, they are also now the "applicable criteria" under state law. *See* OAR 340-041-0002(4). Finally, the new natural condition criteria have far more than a "practical effect" on water quality standards. They literally "supplant" or "supersede" the prior, EPA-approved numeric criteria. *NWEA II*, 855 F.Supp.2d at 1217–18. Thus, EPA had a nondiscretionary duty to review the new criteria under CWA Section 303(c) and to determine if they protect Oregon's designated uses. 40 C.F.R. § 131.5(a)(2).

In short, by approving the 14 TMDLs at issue in this case, EPA allowed Oregon to use the

NCC to erase and replace its numeric criteria with new natural condition criteria based on the

NCC without taking action under CWA Section 303(c). This failure is fatal because the record

demonstrates that EPA did not evaluate whether the new natural condition criteria—sometimes

as high as 90˚F and within the "lethal" range for salmonids—will protect designated uses. This

Court should grant summary judgment to NWEA on its second claim for relief.[13]

2.     EPA Acted Arbitrarily and Capriciously by Approving Temperature
       TMDLs that Do Not Implement "Applicable" Standards.

By approving TMDLs that establish, and then implement, new natural condition criteria,

EPA also violated CWA Section 303(d), which specifies that every TMDL must "implement the

*applicable* water quality standards." 33 U.S.C. § 1313(d)(1)(C) (emphasis added).

Under the CWA, water quality standards are not "applicable" unless and until EPA

approves them under Section 303(c). 40 C.F.R. § 131.21(c–d); *see also Alaska Clean Water*

*Alliance v. Clarke*, 1997 WL 446499 at *2 (W.D. Wash. July 8, 1997) ("[N]ew or revised water

quality standards only become effective after EPA has completed its review process and

approved the standards under the CWA."). Thus, once EPA approves a water quality standard, it

"remains the applicable standard until EPA approves a change, deletion, or addition to that water

quality standard, or until EPA promulgates a more stringent water quality standard." 40 C.F.R. §

131.21(e).

When EPA approved Oregon's temperature TMDLs, Oregon's existing numeric criteria—

ranging from 12˚C to 20˚C—were the "applicable" criteria. *See* AR0460. Thus, those criteria,

---

[13] NWEA's second claim for relief is properly brought under the CWA's citizen suit provision because EPA violated its mandatory duty to review Oregon's new natural condition criteria under CWA Section 303(c). But if this Court determines that EPA's decision to not review the new criteria is an agency action challengeable only under the APA, for the reasons set forth above, its decision was arbitrary and capricious within the meaning of 5 U.S.C. § 702 and this Court should grant summary judgment to NWEA on its third (alternative) claim for relief, Dkt. 11 at 35.

along with other narrative criteria and use designations, were the "minimum" standards to be used in calculating TMDLs for Oregon's rivers and streams. 40 C.F.R. § 131.21(d). Because Oregon's temperature TMDLs do not implement those EPA-approved criteria—but rather new natural condition criteria generated for the first time during the TMDL process *without* having undergone Section 303(c) review—EPA's approval was arbitrary, capricious, and not in accordance with CWA Section 303(d). 5 U.S.C. § 706(2)(A). Again, the TMDLs utterly, and illegally, blur the purposes and requirements of Sections 303(c) and 303(d) of the CWA. This Court should grant summary judgment to NWEA on its first claim for relief.

3.     EPA Acted Arbitrarily and Capriciously by Approving TMDLs that Do Not Contain Adequate Margins of Safety.

Last, Oregon's conflation of the TMDL process and standards-making process resulted in deeply confused margins of safety that violate Section 303(d) of the CWA. For this reason, too, EPA's approval of the TMDLs was arbitrary, capricious, and not in accordance with the law.

Section 303(d) requires every TMDL to contain a "margin of safety which takes into account any lack of knowledge concerning the relationship between effluent limitations and water quality." 33 U.S.C. § 1313(d)(1)(C). The purpose of a margin of safety is to compensate for uncertainties surrounding a TMDL's calculation of a waterbody's loading capacity. As discussed above in Section II.A, "loading capacity" is the total amount of pollution that can enter a waterbody while still achieving applicable standards. 40 C.F.R. § 130.2(f). In the TMDL, portions of the loading capacity are then allocated to individual point and nonpoint sources of pollution. *See* 40 C.F.R. § 130.2(i). To ensure that these allocations do not exceed the waterbody's actual loading capacity, and to compensate for fully expected uncertainties in the TMDL's application of standards to actual waterbodies, a portion of the loading capacity is often reserved as a "margin of safety." AR0438 at 21587. This is commonly expressed as a

mathematical equation, where "LC" represents the waterbody's loading capacity, and "MOS" represents the margin of safety: TMDL = LC = WLA + LA + MOS. *See id.* at 21587. Margins of safety can be implicit, in conservative assumptions for estimating the waterbody's loading capacity, or they can be explicit, by making them a specific allocation. *Id.* at 21575.

In all but one of the fourteen temperature TMDLs (the Malheur), the margins of safety are described, in whole or in part, as being implicit in the purportedly "conservative" approach that Oregon used to develop its new natural condition criteria.[14] According to Oregon and EPA, many inputs and variables are not reflected in the state's estimate of natural conditions, including both natural cooling effects that were not included (e.g., groundwater and flows[15]), and anthropogenic warming effects that were.[16] Oregon and EPA claim this approach constitutes a

---

[14] *See, e.g.,* AR00005 at 90 (Rogue, Applegate); AR0034 at 724 (Snake); AR0068 at 3830 (Sandy); AR0085 at 4216 (Umatilla, Walla Walla); AR0108 at 4971 (Willamette); AR0165 at 10495 (Umatilla, Willow); AR0182 at 11148-49 (Umpqua); AR0218 at 12779-80 (Rogue, Bear); AR0247 at 13496-97 (Molalla-Pudding); AR0283 at 14469 (Rogue); AR0309 at 15526-27 (Middle Columbia, Miles Creeks); AR0322 at 15869 (Lower Grande Ronde); AR0371 at 17855 (John Day).

[15] *See, e.g.*, AR0322 at 15869 (Grande Ronde, Lower Grande Ronde Subbasin) ("Generally, groundwater has a cooling influence on stream temperatures via mass transfer/mixing. These underestimates of groundwater influence are considered a margin of safety.").

[16] Anthropogenic influences that were omitted from determinations of purportedly natural criteria are set out at: AR00005 at 63 (Rogue, Applegate; channel armoring and wetland draining), *id.* at 90 (current tributary temperatures and flows); AR0034 at 1131 (Snake: upstream sources, impoundments, changes in flow, channel straightening, diking, and removal of riparian vegetation); AR0085 at 4203 (Umatilla, Walla Walla: channel armoring, wetland draining, urbanization) AR0086 at 4329 (Umatilla, Walla Walla: mainstem and tributary flows); AR0108 at 4913 (Willamette: some dams, tributary temperatures), *id.* at 4914 (dams, flow, simplified channel), *id.* at 4915 (loss of channel complexity, velocities); *id.* at 4918 (deepening, bank armoring, dike construction, aggregate mining, wetlands and floodplain reclamation); AR0166 at 10598 (Umatilla, Willow Creek: channel conditions, hydrology); AR0182 at 11137 (Umpqua: floodplain connectivity, large woody debris, channel complexity), *id.* at 11118 (dam reservoirs); AR0218 at 12760 (Rogue, Bear: loss of off-channel areas, natural stream widths), *id.* at 12764, (irrigation activities); AR0253 at 13720 (Molalla-Pudding: tributary temperatures and flows); AR0283 at 14427 (Rogue: stream location, hydrology), *id.* at 14434 (58 dams); AR0309 at 15505 (Middle Columbia, Miles Creeks: dams), *id.* at 15527 (estimated tributary natural conditions); AR0319 at 15782 (Lower Grande Ronde: channel width and bank stability);

"margin of safety" because, by not including these effects, waters will be cooler than the new criteria (assuming the load reductions in the TMDLs actually occur). *See, e.g.*, AR0005 at 90; AR0319 at 15786.

But Oregon's TMDLs did not merely establish loading capacities and allocations to meet scientifically-defensible standards. Instead, the TMDLs established *new* goalposts—*new* natural condition criteria—that are both less protective of designated uses and warmer than truly natural temperatures would be. *Cf.* OAR 340-041-0002(41). As a consequence of EPA's approval of the TMDLs, these warmer temperature criteria are the legal basis for all regulatory actions to control temperature inputs from point and nonpoint sources; TMDL allocations would have to be lower and pollution control actions that would have to be greater if the criteria themselves were colder.

EPA and Oregon have claimed as a margin of safety not that which guards against the effects of uncertainty in achieving existing standards, but that which creates uncertainty in the appropriateness of new standards. Oregon's inability to establish appropriately cold temperature criteria that mimic natural conditions is not the margin of safety Congress intended. Rather, the claimed margin of safety is the very opposite of what the statute requires. It uses uncertainty to move the goalposts, rather than to adjust TMDL allocations and the pollution control requirements to stay within the goalposts.

As above, this fatal flaw in the TMDLs' margins of safety flows from Oregon's conflation of the TMDL and standards-making process. New criteria are required by law to protect the most sensitive designated uses, *see* 40 C.F.R. § 131.11(a), which the NCC criteria clearly do not. That Oregon's rivers and streams might someday be cooler than Oregon's current best estimates of natural conditions is no rationale for setting those new criteria at higher

---

AR0342 at 16825 (Malheur: all changes except riparian vegetation); AR0371 at 17823 (John Day: groundwater and sinuosity); AR0373 at 18071 (John Day: current tributary temperatures)

temperatures than salmon can safely bear. And the uncertainty in setting those new criteria cannot be equated to the required margin of safety in the state's establishing a TMDL for how pollution sources must be regulated to attain water quality standards. EPA's approval of the TMDLs, which lack margins of safety within the plain meaning of Section 303(d) of the CWA, was arbitrary and capricious. This Court should grant summary judgment to NWEA on its fifth claim for relief.

       C.      <u>The Temperature TMDLs Fail to Implement *All* Applicable Standards.</u>

Finally, not only do the TMDLs implement new, *unapproved* natural condition criteria in lieu of Oregon's applicable numeric criteria, they ignore other, equally-applicable water quality standards.

CWA Section 303(d)(1)(A) requires each state to identify "those waters" expected not to achieve "*any* water quality *standard* applicable to such waters." 33 U.S.C. § 1313(d)(1)(A) (emphasis added). In turn, Section 303(d)(1)(C) requires TMDLs "to implement *the* applicable water quality *standards." Id.* § 1313(d)(1)(C) (emphasis added). Thus, while a waterbody must be listed on the 303(d) list if it fails to meet any *one* standard, TMDLs must be calculated to attain *all* standards. *Anacostia Riverkeeper, Inc. v. Jackson*, 798 F.Supp.2d 210, 224–35 (D.D.C. 2011) ("TMDLs must implement all water quality standards made applicable to a water body under state law"); *see also Envtl. Def. Fund, Inc. v. Costle*, 657 F.2d 275, 294 (D.C. Cir. 1981). For example, not only must a TMDL implement all applicable criteria, it must be sufficient to support the designated uses, too. *Anacostia Riverkeeper,* 798 F.Supp.2d at 224. Oregon's temperature TMDLs fail to address all applicable standards.

First, consistent with CWA Section 303(c)(2)(A) and EPA's regulations at 40 C.F.R. § 131.10(a), Oregon's water quality standards for each of the 14 basins require water quality to "be

managed to protect the designated beneficial uses," namely salmonids and other cold-water species.[17] As a stand-alone provision of Oregon's water quality standards, this plainly requires protection of designated uses *in addition to* achievement of applicable criteria. Yet, the TMDLs simply do not analyze whether Oregon's new natural condition criteria will protect cold-water species.

Even when criteria are met, designated uses may be harmed.  *See PUD No. 1 of Jefferson County v. Wash. Dep't of Ecology*, 511 U.S. 700, 717 (1994).[18]  Here, there is every reason to conclude they will be. By EPA's own estimate, Oregon's natural condition criteria may be "lethal" to salmonids. *See* AR0462 at 24839–40. In turn, Oregon's inability to model truly "natural" conditions belies the most fundamental assumption underlying the NCC's alleged protectiveness—namely, that natural conditions fully supported salmonids in the past. *See NWEA II,* 855 F. Supp.2d at 1218. Because it failed to evaluate whether Oregon's new natural condition criteria will protect designated uses, EPA's approval of the TMDLs was arbitrary and capricious.

Second, the temperature TMDLs for the Willamette and John Day Rivers failed to implement the state's narrative criterion for "cold water refugia," which requires waterbodies designated as migration corridors to "have cold water refugia that are sufficiently distributed so as to allow salmon and steelhead migration without significant adverse effects from higher water temperatures elsewhere in the water body." OAR 340-041-0028(4)(d).[19] The purpose of this

---

[17] *See* OAR 340-041-0271(1), -0121(1), -0286(1), -0310(1), -0340(1), -0320(1), -0151(1), -0201(1), and -0170(1).

[18] The Supreme Court noted: "While enforcement of criteria will *in general* protect the uses of these diverse waters, a complementary requirement that activities also comport with designated uses enables the States to ensure that each activity—even if not foreseen by the criteria—will be consistent with the specific uses and attributes of a particular body of water." *Id*. (emphasis added).

[19] The Migration Corridor use and cold-water refugia criterion apply in the lower 50 miles of the Willamette River and in the John Day River. AR0146, AR0386.

criterion is to preserve and enhance "habitats and locations where temperature sensitive cold water species may find refuge when ambient stream temperatures are stressful," namely 20˚C. AR0108 at 4896. This Court has observed that cold-water refugia are "crucial to the survival of salmonids in suboptimal temperatures." *NWEA II*, 855 F.Supp.2d at 1214.[20]

When EPA approved Oregon's cold-water refugia criterion, it explained that refugia would be "identified and determined" during the TMDL process. AR0461 at 24758–59. But that has not happened. The Willamette Mainstem TMDL does not identify or determine the locations of refugia. Instead, it states that identifying and protecting refugia "*will be* a key element for TMDL implementation," without explaining how, when, and by whom. AR0462 at 4896 (emphasis added). Nor does the TMDL explain how it meets water quality standards without identifying refugia. *See id*. The John Day TMDL does not even cite the refugia requirement. *See generally* AR0371. Finally, in its response to comments on the Willamette Mainstem and John Day TMDLs, Oregon stated only that implementation of the TMDLs would provide *some* cold water refugia because the waterbodies' "natural condition" would be restored. *See* AR0122 at 6445, AR0380 at 18324. But there is no indication that Oregon or EPA determined that this was true. Nor did they evaluate whether such unidentified refugia would be "sufficiently distributed" to protect migrating salmonids as required by the criterion.

Finally, by its own terms, the Umpqua TMDL fails to implement Oregon's 13°C criterion for salmon and steelhead spawning, OAR 340-041-0028(4)(a). Reflecting the plain language of Section 303(d), EPA stated in its approval letter for the Umpqua TMDL that it "only considers

---

[20] *See also* AR0461 at 4910 ("Implementation of the TMDL and attainment of narrative criteria in Oregon temperature standards will require the protection and restoration of diverse stream habitats and thermal regimes throughout the basin. *This is especially true where temperatures exceed the biologically-based criteria and refugia are necessary to sustain cold water species.*") (emphasis added).

the TMDL for a specific waterbody as complete when the TMDL analyses for *all* criteria for a pollutant are approved." AR0174 at 10913. Yet EPA approved the TMDL despite Oregon's having failed to address violations of the spawning criterion for the North Umpqua River and nine other rivers and streams where the spawning criterion could be impaired.

Because EPA failed to determine whether the 14 Oregon temperature TMDLs will implement *all* applicable standards, EPA's approval was arbitrary, capricious, and not in accordance with the law. 5 U.S.C. § 706(2)(A). This Court should grant summary to NWEA on its fourth claim for relief.

     D.      <u>EPA's Approvals of the Temperature TMDLs Violated the ESA.</u>

As discussed above, the ESA requires each federal agency to ensure that its actions do not jeopardize threatened and endangered species, or destroy or adversely modify critical habitat. 16 U.S.C. § 1536(a)(2). Under ESA Section 7, federal agencies must determine whether their actions "may affect" listed species or, alternatively, will have "no effect." *Karuk Tribe*, 681 F.3d at 1027. If an action "may affect" a listed species, formal consultation with the Services is required. 50 C.F.R. § 402.14(a). An agency's failure to make a threshold determination—as well as its failure to consult after making an erroneous "no effects" determination—is actionable under the ESA's citizen suit provision. *Kraayenbrink*, 632 F.3d at 495.

Aside from the Snake River and Willamette Basin TMDLs, EPA never determined whether Oregon's temperature TMDLs "may affect" listed species. Nor did EPA confer with the Services regarding the temperature TMDLs, or obtain the Services' written confirmation that the TMDLs are "not likely to adversely affect" listed salmonids. *See* 50 C.F.R. § 402.14(b)(1). By failing to comply with the mandatory procedural requirements in Section 7, EPA is in clear violation of the ESA.

1.    For the Majority of Oregon's Temperature TMDLs, EPA Failed to
Comply with Any of the Procedural Requirements of ESA Section 7.

In *Karuk Tribe of California v. United States Forest Service*, the Ninth Circuit expressed

its most recent articulation of what constitutes "agency action" for purposes of triggering Section

7 of the ESA: "Our 'agency action' inquiry is two-fold. First, we ask whether a federal agency

affirmatively authorized, funded, or carried out the underlying activity. Second, we determine

whether the agency had *some* discretion to influence or change the activity for the benefit of a

protected species." 681 F.3d at 1021 (emphasis added).

Here, EPA's approval of Oregon's temperature TMDLs easily satisfies the *Karuk Tribe*

test. First, there can be no doubt that EPA "affirmatively *authorized*, funded, or *carried out*" the

underlying activity." *Id.* at 1021 (emphasis added). Not only must states submit TMDLs to EPA

for approval (i.e., they must obtain EPA's "authorization"), if EPA rejects the TMDL, EPA must

establish a replacement TMDL that satisfies the requirements of the CWA (i.e., it must "carry

out" the action itself). 33 U.S.C. § 1313(d)(2).

Second, during its TMDL review process, EPA clearly had "*some* discretion to influence

or change the activity for the benefit of a protected species." *Karuk Tribe*, 681 F.3d at 1021

(emphasis added). First, the CWA itself gives EPA sweeping authority to reject a state TMDL

and to establish its own TMDL for the affected waterbody. 33 U.S.C. § 1313(d)(2). In turn, not

only does the CWA *allow* EPA to influence the TMDL process for the benefit of listed species—

it *requires* EPA to do so. As discussed above, EPA has a mandatory duty to ensure that TMDLs

not only achieve applicable standards, but that they protect the designated uses, too. *See*

*Anacostia Riverkeeper*, 798 F.Supp.2d at 231 (The CWA requires every TMDL to "protect *all*

water quality standards specified under state law as applicable to the river—including all

designated uses"). In Oregon, designated uses represent the state's cold-water salmonids, many

of which are listed as threatened and endangered under the ESA. *See supra* Note 6; *see also* AR0465, AR0466. By requiring EPA to protect these uses, the CWA plainly authorizes EPA to exercise "discretion to influence or change the activity for the benefit of a protected species." *Karuk Tribe*, 681 F.3d at 1021. It is likely for this reason that, to NWEA's knowledge, EPA has never contested its duty to consult on TMDLs in any case where the issue has arisen.[21]

Indeed, EPA recognized its discretionary control over Oregon's temperature TMDLs in prior proceedings before this Court. In defending its approval of the NCC, EPA argued that it "would remain involved in the implementation of the natural conditions provision, including through EPA's approval or disapproval of TMDLs." *NWEA II* (Dckt. No. 261 at 32, n. 28). EPA also asserted that it "would have the authority to disapprove the TMDL . . . based on its inconsistency with Oregon's [water quality standards]. . . . and would retain authority to disapprove [TMDLs] based on, *inter alia*, whether Oregon was fulfilling the requirement to use the best available science and information to determine natural conditions." *NWEA II* (Dckt. No. 279 at 26-27). This Court rejected EPA's argument as a basis for upholding the NCC over the plain requirements of CWA Section 303(c). But the point is that in the context of Oregon's temperature TMDLs, EPA itself has acknowledged its discretionary involvement and control.

Finally, the record demonstrates that EPA's actions in approving the TMDLs "may affect" listed species. By EPA's own estimate, many of the new natural condition criteria are "lethal" to salmonids. *See supra* at 9, 22. At bottom, however, it is not "the responsibility of the plaintiffs to prove, nor the function of the courts to judge, the effect of a proposed action on an

---

[21] *See Dioxin/Organochlorine Ctr. v. Clarke*, 57 F.3d 1517, 1523 n.9 (9th Cir. 1995) (discussing FWS's biological opinion regarding the effects of the TMDL on bald eagles); *Sierra Club v. U.S. Envtl. Prot. Agency,* 162 F.Supp.2d 406, 421–22 (D. Md. 2001) (EPA admitting it was required to consult on TMDLs); *Friends of the Wild Swan, Inc. v. U.S. Envtl. Prot. Agency*, Civil Action No. 99-CV-00087, Dckt. No. 52, (May 23, 2000) (EPA's entering consent decree agreeing to consult on TMDLs).

endangered species[.]" *Thomas,* 753 F.2d at 765. EPA must, at the very least, make a threshold determination regarding the impact of the TMDLs on Oregon's threatened and endangered salmonids.

Because EPA failed to take any action under the ESA for 12 of the TMDLs at issue in this case—i.e., it failed even to determine whether the TMDLs "may affect" listed species—EPA is in violation of ESA Section 7(a)(2) and NWEA is entitled to summary judgment on its sixth claims for relief.

> 2. EPA Failed to Determine whether the New Natural Condition Criteria in the Willamette Temperature TMDL "May Affect" Listed Species.

In addition to its failure to take any action under the ESA on 12 of Oregon's temperature TMDLs, EPA also failed to determine whether the new natural condition criteria in the Willamette Basin temperature TMDL "may affect" listed species.

In September of 2006, EPA issued a "no effect" determination for its approval of the Willamette Basin temperature TMDL. *See* AR0151. The determination was based solely on EPA's having allegedly cabined its review to the TMDL's loading capacity, WLAs, LAs, and margin of safety, all of which EPA concluded had "no effect" on salmonids because they simply implemented already-approved standards. *See id.* at 8514; *see also id.* at 8516 ("EPA's approval of a TMDL relates only to the State's mathematical calculation of the appropriate allocations necessary to meet water quality standards.").

The record belies EPA's justification. In approving the TMDL, EPA discussed at length Oregon's use of the NCC to supplant the numeric temperature criteria. AR0099 at 4657. EPA concluded that there was no "one 'right' way" to determine natural conditions and that it had reviewed Oregon's use of the NCC "to determine if [Oregon's] assumptions and logic was [sic] sufficiently clear as discussed in the TMDL and that the [modeling] decisions made were

reasonable." *Id*. Acknowledging that it was "too complex to model" the Willamette basin's "[n]atural stream channel conditions and natural flow conditions without the dams . . . with [the] limited data available," EPA concluded that Oregon had made a "reasonable" attempt to calculate the rivers' natural thermal potential. *Id*. EPA made detailed findings and approved Oregon's use of the NCC—even in light of the state's inability to model truly natural conditions—to supplant the state's numeric temperature criteria.

EPA clearly reviewed and approved Oregon's use of the NCC. Regardless of whether EPA's action arose under Section 303(d) or Section 303(c) of the CWA, EPA's use of a "reasonableness" standard in approving Oregon's actual use of the NCC to define new criteria is the very epitome of a discretionary agency action. *Karuk Tribe*, 681 F.3d at 1021 (federal agency must comply with the ESA whenever it has "*some discretion* to influence or change the activity for the benefit of a protected species") (emphasis added). In addition to the actions for which EPA did make threshold decisions under the ESA (i.e., its review and approval of the TMDL's loading capacity, WLAs, LAs, and margin of safety), EPA was required to undertake ESA review for its approval of Oregon's new NCC-generated criteria as well.

EPA wholly failed to determine whether the new natural condition criteria in the Willamette temperature TMDL "may affect" listed species. EPA is in violation of ESA Section 7(a)(2) and this Court should grant summary judgment to NWEA on its seventh claim for relief.

> E.    EPA Violated Section 303(d) of the CWA by Failing to Approve or Reject the Klamath Basin Temperature TMDL within 30 Days of Submission.

Section 303(d) of the CWA provides that EPA "shall either approve or disapprove" a proposed TMDL "not later than thirty days after the date of submission." 33 U.S.C. § 1313(d)(2). This requirement imposes a nondiscretionary duty within the meaning of the CWA citizen suit provision, 33 U.S.C. § 1365; *Nat. Resources Def. Council, Inc. v. Fox*, 93 F.Supp.2d 531, 558

(S.D. N.Y. 2000), *vacated in part on other grounds sub nom Nat. Resources Def. Council, Inc. v. Muszynski*, 268 F.3d 91 (2nd Cir. 2001).

On December 21, 2010, Oregon submitted its Klamath Basin temperature TMDL to EPA for review under Section 303(d). *See* AR0398. In its answer, EPA admits that it has not acted on the TMDL. *See* Dkt. 12 at 14, ¶ 71 ("Defendant admits that it has neither approved nor disapproved the Klamath Basin temperature TMDL"). Because more than thirty days have elapsed, EPA breached its duty to take timely action on Oregon's submission and NWEA is entitled to summary judgment on its eighth claim for relief.

F.    EPA's Approval of the Willamette Basin Mercury TMDL was Arbitrary and Capricious.

As discussed above in Section III.E, Oregon's Willamette Basin Mercury TMDL establishes a tentative "interim guidance value" to protect human health from mercury-contaminated fish in the Willamette basin. AR0107 at 4881. The Mercury TMDL did not, however, establish acceptable levels of mercury for piscivorous birds and mammals that are similarly harmed. Nor does the TMDL contain any of the regulatory hallmarks of a valid TMDL. EPA's approval of the Mercury TMDL was arbitrary, capricious, and not in accordance with the law, 5 U.S.C. § 706(2)(A).

1.    The Mercury TMDL Does Not Implement Water Quality Standards for the Protection of Wildlife.

Section 303(d) of the CWA requires a TMDL to implement "*all* water quality standards, including [protection of] *all* designated uses and *all* criteria." *Anacostia Riverkeeper*, 798 F.Supp.2d at 235 (emphasis added). In the Mercury TMDL, Oregon took a first, tentative step toward reducing mercury for the protection of human health. *See, e.g.,* AR0099 at 4646. To do so, Oregon relied on its narrative toxics criterion:

> Toxic substances may not be introduced above natural background levels in waters of the state in amounts, concentrations, or combinations that may be harmful, may chemically change to harmful forms in the environment, or may accumulate in sediments *or bioaccumulate in aquatic life or wildlife to levels that adversely affect public health, safety, or welfare or aquatic life, wildlife, or other designated beneficial uses*.

OAR 340-041-0033(2) (emphasis added).

The Mercury TMDL acknowledges that mercury is harmful to all animals, including "top predators" in the food chain. *See* AR0120 at 5991; AR0154 at 3–4. But despite the plain language of both Oregon's narrative toxics criterion and its designated uses requiring protection of wildlife,[22] the TMDL makes no attempt to identify an acceptable level of mercury for the basin's piscivorous birds and mammals.

Oregon gave two rationales for its failure to address wildlife impacts: (1) the TMDL addressed 303(d) listings based on fish consumption advisories for people, *see* AR0107 at 4856; and (2) Oregon lacks a numeric criterion for wildlife protection. *See* AR0122 at 6378 (declining to address wildlife because Oregon "does not currently have established numeric criteria specifically for protection of wildlife in its Administrative Rules"). But these rationales do not excuse Oregon from the plain language of Section 303(d) and the requirement to address all applicable standards, including *all* designated uses. *Anacostia Riverkeeper*, 798 F.Supp.2d at 235. Nor was it impossible for Oregon to translate its narrative criterion and use designations into a TMDL that protects all animals. Public comments provided a number of federal studies "all [of which] contain levels that are very similar for the protection of such wildlife as bald eagles." AR0122 at 6376-77. EPA had access to the same information when it approved the

---

[22] As discussed above in Section V.C, OAR 340-041-0340(1) provides that "[w]ater quality in the Willamette Basin . . . *must be managed to protect the designated uses*."  Willamette Basin designated uses include "Wildlife & Hunting." *See* OAR 340-041-0340, Table 340A.

Mercury TMDL. AR0154 at 142.[23]

Oregon's lack of a numeric mercury criterion for wildlife does not render its narrative criterion or designated uses a nullity; the CWA requires every TMDL to address *all* applicable standards. By failing to implement standards for the protection of wildlife, EPA's approval of the Mercury TMDL violates the plain language of CWA Section 303(d).

2.    The Mercury TMDL Is Not Set at a Level to Attain Water Quality Standards.

In addition to failing to address wildlife, by Oregon's estimate the Mercury TMDL fails to implement the state's standards relating to the public's consumption of fish.

As discussed above, the TMDL establishes an "interim guidance value" that Oregon will need to update through "iterative adaptive management." AR0107 at 4861. Oregon admits that it is "*likely* that the interim guidance values presented in [the] TMDL will change as more data and information are incorporated into the analysis." *Id*. In other words, the TMDL does not claim to identify pollution reductions necessary even to protect the beneficial use of fishing. Indeed, Oregon's to-do list is quite lengthy:

> Potential projects include: refining [the TMDL's] estimate of sediment resuspension; quantifying tributary inputs; identifying sinks and sources of mercury determining the systems [sic] responsiveness to decreases in mercury loading; and clarifying how much of the mercury associated with each source category is actually bioavailable for uptake into aquatic organisms. It will also be

---

[23] Comments submitted on the draft TMDL also discussed California's Clear Lake Mercury TMDL, where the state relied on the recommendation of the United States Fish and Wildlife Service to use mercury concentrations of 0.09 mg/kg and 0.19 mg/kg for the protection of osprey and bald eagles. These values are significantly lower than the fish-tissue concentration that Oregon targeted with its interim water-column guidance value of 0.92 ng/L. *See* AR0107 at 4881 (the interim guidance value seeks to achieve a fish-tissue concentration of 0.3 mg/kg). The California Clear Lake Mercury TMDL is also discussed in EPA's draft guidance in the administrative record. *See* AR0154 at 142. In addition, public comments on the Willamette Mercury TMDL discussed EPA's Mercury Report to Congress, recommending wildlife criteria in the range of 0.027 ng/l to 0.082 ng/l. EPA's Report to Congress is available at http://www.epa.gov/ttn/oarpg/t3/reports/volume7.

essential to incorporate additional ambient data and more extensive source data (on total mercury and dissolved methyl mercury concentrations and discharge rates) from key major industrial, municipal and stormwater source categories. *The lack of adequate information on mercury source contributions from the various source categories mentioned above is a significant limitation of this TMDL.*

AR0107 at 4886 (emphasis added). *See also id.* ("Additional information is also needed to better understand the significant seasonal variations known to affect mercury loading and methylation in the Willamette River system").[24]

The Mercury TMDL simply does not satisfy the statutory requirement to cap pollution "at a level necessary to *implement the applicable water quality standards* with seasonal variations and a margin of safety." 33 U.S.C. § 1313(d)(1)(C) (emphasis added). That deficiency is not cured by Oregon's invocation of "adaptive management," its use of an "interim" approach to the mercury problem, or by its identifying a laundry list of tasks necessary to complete the Mercury TMDL.[25] By approving a TMDL that fails—by its own terms—to calculate the level of pollution reduction necessary to attain water quality standards, EPA's approval of the Mercury TMDL was arbitrary, capricious, and not in accordance with the law. 5 U.S.C. § 706(2)(A).[26]

---

[24] In light of this long list of tasks that Oregon must still complete, is no accident that Oregon describes the TMDL as a "study" or "document" that makes "policy recommendations," not as a true TMDL calculated to attain standards. *See* AR0107 at 4861, 4886.

[25] *See Minn. Ctr. for Envtl. Advocacy v. U.S. Envtl. Prot. Agency*, 2005 WL 1490331 at *5 (D. Minn. June 23, 2005) ("[A] phased calculation that is not designed to return impaired segments to water quality standards is not in accordance with law. . . . EPA and [the state] cannot classify its action as an 'interim' or phased approach in order to get around the fact that the current calculations included in [a TMDL] are insufficient to return the impaired waterways to meeting water quality standards.").

[26] EPA also failed to evaluate the very core of the TMDL to determine if Oregon's interim guidance value protects public health. The guidance value was calculated to attain the then-proposed 0.3 mg/kg fish tissue criterion, which was based on a fish consumption rate of 17.5 grams per day. *See* AR 06341 at 06380-81, 6392. EPA's approval explains only that Oregon did not evaluate the value used by the Department of Health because Oregon "did not believe it was appropriate to conduct this evaluation since the basis of the 303(d) listing is the advisory issued by ODHS and the mercury consumption rates established by that Agency." AR0099 at 4646. In

3.    The Mercury TMDL Does Not Contain Seasonal Variations.

Oregon's lack of knowledge regarding seasonal variations in mercury loading is a critical impediment to achieving water quality standards. In large part, this is due to a poor understanding of the inflow of mercury-laden sediment during the rainy season, and of the conversion of mercury to methylmercury by bacteria in the summer. AR0107 at 4877. The TMDL acknowledges these significant data gaps, but explains only that *future* studies will "determine how best to incorporate seasonal variation into the mercury TMDL." *Id*.

By failing to incorporate seasonal variation, the TMDL violates the plain language of CWA Section 303(d), which requires every TMDL to be established at a level to meet water quality standards "with seasonal variations." 33 U.S.C. § 1313(d)(1)(C).

4.    The Mercury TMDL Lacks Individual Wasteload Allocations.

One of a TMDL's primary purposes is to establish WLAs from which water quality-based discharge limits are derived for NPDES permits. *See, e.g.,* 40 C.F.R. § 122.44(d)(1)(vii)(B) (permit limits must be "consistent with the assumptions and requirements of any available wasteload allocation"); AR0438 at 21590 (describing the relationship between WLAs and NPDES permit limits). Individual WLAs are especially important because, without them, multiple NPDES permit writers would "lack the coordination required to effectively 'divvy up acceptable pollution levels among [the sources].'" *Am. Farm Bureau Fed'n v. U.S. Envtl. Prot. Agency*, 984 F.Supp.2d 289, 322 (M.D. Pa. 2013), *quoting Anacostia Riverkeeper*, 798 F.Supp.2d at 250.

Accordingly, EPA's regulations define WLAs as an allocation to *individual* point sources. *See* 40 C.F.R. § 130.2(h) (defining "Wasteload allocation" to mean "[t]he portion of a

other words, neither Oregon nor EPA evaluated whether the assumed fish consumption rate was adequate to meet the narrative criterion and designated uses at the heart of the TMDL.

receiving water's loading capacity that is allocated to *one of* its existing or future point sources of pollution") (emphasis added). *See also Anacostia Riverkeeper*, 798 F.Supp.2d at 248–49 (a "core requirement" of any TMDL is the allocation of "daily caps among *each point source* of pollution") (emphasis added).

The Mercury TMDL does not allocate WLAs to individual point sources in the Willamette basin. Instead, the TMDL assigns "interim wasteload allocations" to broad "source sector categories," AR0107 at 4882, which it does not intend to use in NPDES permits. *Id.* at 4850. Thus, the WLAs in the Mercury TMDL not only violate the plain language of EPA's implementing regulations, they defeat the purpose of WLAs as guiding the NPDES permitting process. As above, EPA's approval was arbitrary and capricious.

5.     <u>The Mercury TMDL Does Not Establish a "Daily" Load.</u>

Finally, Oregon's Mercury TMDL violates the very definition of "total maximum daily load" because it fails to establish *daily* limits. *See* 33 U.S.C. § 1313(d)(1)(C). As the D.C. Circuit has observed, "[n]othing in this [statutory] language even hints at the possibility that EPA can approve total maximum 'seasonal' or 'annual' loads. The law says 'daily.' We see nothing ambiguous about this command." *Friends of the Earth, Inc. v. U.S. Envtl. Prot. Agency*, 446 F.3d 140, 144 (D.C. Cir. 2006).

Here, the Mercury TMDL is limited to an *annual* loading capacity, not a daily one. *See* AR0107 at 4881; AR0099 at 4649. As above, EPA's approval of the Mercury TMDL was arbitrary, capricious, and not in accordance with the law. 5 U.S.C. § 706(2)(A). This Court should grant summary judgment to NWEA on its ninth claim for relief.

## VI.    CONCLUSION

For the reasons above, plaintiff Northwest Environmental Advocates requests summary judgment on its Clean Water Act and Endangered Species Act claims.

DATED this 25th day of November, 2014.

Respectfully submitted,


BRICKLIN & NEWMAN, LLP                    EARTHRISE LAW CENTER


s/ Bryan Telegin                                     s/ Allison LaPlante
Bryan Telegin, OSB # 105253                  Allison LaPlante, OSB # 023614


*Attorneys for Plaintiff NWEA*