IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

NORTHWEST ENVIRONMENTAL
ADVOCATES,

        Plaintiff,

   v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY,

        Defendant,

and

STATE OF OREGON, OREGON WATER
QUALITY STANDARDS GROUP, and
THE FRESHWATER TRUST,

      Intervenor-Defendants.

No. 3:12-cv-01751-AC

ORDER

HERNÁNDEZ, District Judge:

Before this Court are two Findings & Recommendations ("F&Rs"), referred from Magistrate Judge Acosta, addressing cross-motions for summary judgment in a case brought by Plaintiff Northwest Environmental Advocates ("NWEA"). NWEA alleges that Defendant Environmental Protection Agency ("EPA") violated the Administrative Procedures Act ("APA"), Clean Water Act ("CWA"), and Endangered Species Act ("ESA"). NWEA brings 10 claims against the EPA. The State of Oregon ("Oregon"), Oregon Water Quality Standards Group ("OWQSG"), and The Freshwater Trust have intervened as defendants.

NWEA challenges the EPA's review and approval, or lack of approval, of certain temperature and mercury Total Maximum Daily Loads ("TMDLs") submitted by Oregon. Specifically, NWEA's claims target 14 Oregon temperature TMDLs ("temperature TMDLs") approved by the EPA between 2004 and 2010; the Klamath Basin temperature TMDL ("Klamath Basin TMDL") submitted by Oregon but never approved by the EPA; and the Willamette Basin mercury TMDL ("Willamette Basin TMDL") approved by the EPA in September of 2006. Sec. Am. Compl. ¶¶ 3-10, ECF 11.

Magistrate Judge Acosta's first F&R [132] ("Summary Judgment F&R") addresses the temperature TMDL claims and partially grants summary judgment to NWEA and partially grants summary judgment to the EPA. *See* Summ. J. F&R 46, ECF 132. NWEA, the EPA, Oregon, and OWQSG all object to the F&R.

The second F&R [133] ("Voluntary Remand F&R") addresses the Klamath Basin TMDL and the Willamette Basin TMDL. *See* Vol. Remand F&R, ECF 133. Judge Acosta grants the EPA's motion for voluntary remand of these two TMDLs. *Id.* at 27. OWQSG objects.

The matter is now before the Court pursuant to 28 U.S.C. § 636(b)(1)(B) and Federal Rule of Civil Procedure 72(b). When any party objects to any portion of the Magistrate Judge's Findings & Recommendation, the district court must make a *de novo* determination of that portion of the Magistrate Judge's report. 28 U.S.C. § 636(b)(1); *Dawson v. Marshall*, 561 F.3d 930, 932 (9th Cir. 2009); *United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003) (en banc). The Court has conducted such a review and adopts portions of the F&Rs and declines to adopt other portions, as explained below. The Court has also reviewed the pertinent portions of the record *de novo* and finds no other errors in the F&Rs beyond what are discussed in this Order. Because Judge Acosta's F&Rs include all of the necessary factual background regarding this case, this Order does not repeat the facts except when necessary.

## I.    Claims 1-3: CWA Claims

The parties do not object to Judge Acosta's findings and recommendations as to Claims 1, 2, and 3. The Court finds no errors and, accordingly, adopts this portion of the Summary Judgment F&R.

## I.    Claims 4-5: Potentially Moot CWA Claims

The Court adopts Judge Acosta's recommendation to deny NWEA's fourth and fifth claims as moot. No party has objected to Judge Acosta's determination that the invalidation of the NCC should be applied retroactively and that, therefore, the EPA's approvals of temperature TMDLs based on the NCC were arbitrary and capricious. Therefore, entirely new TMDLs (that are not based on the NCC) will need to be established. The issue is whether NWEA is entitled to a ruling on the merits underlying Claims 4 and 5 to determine whether there are additional reasons that the EPA's approval of the TMDLs was arbitrary and capricious.

This Court concludes that, even if Claims 4 and 5 are not technically moot, it is not necessary to reach the merits of these claims. *See, e.g., Air Line Pilots Ass'n, Int'l v. UAL Corp.*, 897 F.2d 1394, 1397 (7th Cir. 1990) ("Although the word 'moot' is sometimes used to refer to an issue that need not be decided in light of the resolution in the same opinion of another issue . . . it has never been thought that a court that does decide it thereby violates Article III's implied prohibition against deciding moot cases. The conceptual reason is that it is cases rather than reasons that become moot.") (internal citations omitted). Judge Acosta properly exercised his discretion to decline to address alternative reasons why the TMDLs' approval was arbitrary capricious. *See, e.g., Wilderness Watch, Inc. v. U.S. Fish & Wildlife Serv.*, 629 F.3d 1024, 1032 n. 5 (9th Cir. 2010) ("Because we hold that Plaintiffs prevail on their claim under the Wilderness Act, we need not and do not reach their claim under the National Environmental Policy Act."); *Air Line Pilots Ass'n*, 897 F. 2d at 1397("Whether a court gives one or ten grounds for its result is not a question to which Article III prescribes an answer."). The Court adopts his recommendation.

## II.     Claims 6-7: ESA Claims

The Court declines to adopt Judge Acosta's findings and recommendation as to Claims 6 and 7. Judge Acosta granted summary judgment to the EPA and the Intervenors. This Court grants summary judgment to NWEA instead.

NWEA's sixth and seventh claims allege that the EPA violated the Endangered Species Act ("ESA"), 16 U.S.C. § 1540(g)(1)(A), in two ways. First, the EPA failed to consult with Fish and Wildlife Service or the NOAA Fisheries Service (collectively, "the Services"), prepare biological assessments, or make a "no-effects" finding before approving Oregon's Temperature

TMDLs.[1] Second, the EPA failed to consult with the Services on the full scope of the Willamette Basin Temperature TMDL.

The Supreme Court has called the ESA "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 176 (1978). The ESA reflects "a conscious decision by Congress to give endangered species priority over the 'primary missions' of federal agencies." *Id.* at 185.

"The heart of the ESA is section 7(a)(2), 16 U.S.C. § 1536(a)(2)." *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 495 (9th Cir. 2011). Section 7 imposes on all agencies a duty to consult with the Services before engaging in any discretionary action that may affect a listed species or critical habitat. *Karuk Tribe of California v. U.S. Forest Serv.*, 681 F.3d 1006, 1020 (9th Cir. 2012) (citing *Turtle Island Restoration Network v. Nat'l Marine Fisheries Serv.*, 340 F.3d 969, 974 (9th Cir. 2003)). The purpose of consultation is to obtain the expert opinion of wildlife agencies to determine whether the action is likely to jeopardize a listed species or adversely modify its critical habitat and, if so, to identify reasonable and prudent alternatives that will avoid the action's unfavorable impacts. *Id.*

Section 7(a)(2) of the ESA provides:

Each Federal agency shall, in consultation with and with the assistance of the Secretary, insure that any action authorized, funded, or carried out by such agency (hereinafter in this section referred to as an "*agency action*") is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat of such species....

16 U.S.C. § 1536(a)(2) (emphasis added). Regulations implementing Section 7 provide:

Each Federal agency shall review its actions at the earliest possible time to determine whether any action *may affect* listed species or critical habitat. If such a determination is made, formal consultation is required[.]

---

[1] NWEA's Complaint states that this claim does not apply to Oregon's Snake River TMDL or the Willamette Basin TMDLs. Sec. Am. Compl. 38, fn. 13, ECF 11.

50 C.F.R. § 402.14(a) (emphasis added).

In order to be an "agency action" requiring Section 7 consultation, the Court must conclude that the action was an "action authorized, funded, or carried out by [a federal] agency." *Karuk*, 681 F.3d at 1020 (citing 16 U.S.C. § 1536). In addition, the ESA implementing regulations limit Section 7's application to "actions in which there is discretionary Federal involvement or control." *Id.* Therefore, the obligation of a federal agency to consult with the Services is based on a two-fold inquiry. *Id.* at 1021. "First, we ask whether a federal agency affirmatively authorized, funded, or carried out the underlying activity. Second, we determine whether the agency had some discretion to influence or change the activity for the benefit of a protected species." *Id.*

Judge Acosta addressed the second part of the *Karuk* inquiry first. He found that the EPA had the requisite discretion to influence or change the activities authorized in the TMDL for the benefit of a protected species. Summ. J. F&R 36. However, when examining the first part of the *Karuk* inquiry, Judge Acosta concluded that the EPA's approval of the TMDLs was not an affirmative action for the purposes of the ESA. Summ. J. F&R 42. Alternatively, he found that the EPA's consultation with regard to Oregon's water quality standards, including the NCC, covered the TMDLs subsequently approved by the EPA as implementing the NCC, thereby eliminating the need for a second ESA consultation on TMDLs implementing NCC-Based Criteria. Summ. J. F&R 42. Therefore, even though Judge Acosta disagreed with the EPA's assertion that its "no effect" finding for the Willamette Basin TMDL could be imputed to subsequent TMDLs, Judge Acosta found no ESA violation. In addition, Judge Acosta found that NWEA's claim based on TMDLs approved by the EPA prior to September 27, 2006 is barred by

the applicable statute of limitations on all claims except NWEA's Second Claim for Relief under the CWA.

Both NWEA and the EPA object to Judge Acosta's conclusions regarding Claims 6 and 7. NWEA objects to Judge Acosta's conclusion, under the first *Karuk* factor, that the EPA's decision approving a TMDL is not an "affirmative action" triggering ESA § 7 consultation requirements. NWEA also objects to Judge Acosta's alternative finding that the EPA was not required to consult on its approval of the NCC-based TMDLs because they were subsumed within the EPA's prior consultation on the NCC. Finally, NWEA objects to Judge Acosta's conclusion that NWEA's ESA claims for the four older TMDLs are time-barred.

Even though Judge Acosta granted summary judgment in its favor, the EPA raises two objections. The EPA disagrees with Judge Acosta's conclusion, under the second *Karuk* factor, that the EPA had discretion to take action to benefit listed species by disapproving the TMDLs. The EPA also objects to the conclusion that it was required to make separate explicit findings that each of the TMDLs had "no effect" on listed species. The EPA contends that its two arguments provide additional reasons for why ESA § 7 consultation was not required. In addition, the EPA argues that the Court does not need to reach Claims 6 and 7 at all, because if it adopts the F&R regarding Claims 1-3, the TMDLs will be unlawful due to CWA violations, regardless of any potential ESA violations.

In this Order, the Court addresses the *Karuk* factors in the order that has been laid out by the Ninth Circuit. Therefore, the Court first discusses whether the EPA's approval of a TMDL is an affirmative agency action. Then, the Court considers whether the EPA had discretion to change the action for the benefit of a protected species. After analyzing these two *Karuk* factors, the Court addresses the remaining objections regarding whether the EPA was required to make

separate findings that each of the TMDLs had "no effect" on the listed species; whether the EPA's prior consultation on the NCC relieved it of a duty to consult on its approval of the NCC-based TMDLs; and whether the ESA claims for the four older TMDLs are time-barred.

**A. The EPA's decision approving a TMDL is an affirmative action triggering ESA § 7 consultation requirements.**

The first issue under *Karuk* is whether the EPA's approval of a TMDL is an affirmative agency action. The ESA's use of the term "agency action" is to be construed broadly. *Karuk*, 661 F.3d at 1021. Examples of such action include, but are not limited to, actions intended to conserve listed species or their habitat; the promulgation of regulations; the granting of licenses, contracts, leases, easements, rights-of-way, permits, or grants-in-aid; or actions directly or indirectly causing modifications to the land, water, or air. 50 C.F.R. § 402.02. An agency must consult with the Services under Section 7 only when it makes an "affirmative" action or authorization. *Id.*

Judge Acosta concluded that the EPA's approval of a TMDL is not an "affirmative agency action," such that it would trigger Section 7 consultation. In reaching his decision, Judge Acosta relied on two district court cases. *See Grand Canyon Trust v. U.S. Bureau of Reclamation*, No. CV078164PCTDGC, 2008 WL 4417227 (D. Ariz. Sept. 26, 2008); *Shell Gulf of Mexico v. Center for Biological Diversity, Inc.,* Case No. 3:12-cv-00048-RRB, Order on Summ. J., ECF 159 (D. Alaska Aug. 5, 2013).

*Grand Canyon* considered whether the United States Bureau of Reclamation ("the Bureau") violated the ESA by failing to consult with the Fish and Wildlife Service ("FWS") each time the Bureau prepared an annual operating plan ("AOP") for the Glen Canyon Dam ("Dam"), which creates Lake Powell in Arizona. *Id.* at *8. The Bureau only had a duty to consult with the FWS if each AOP was an affirmative agency action that triggered the ESA's consultation

requirements. Id. at *8-9. Thus, the court had to decide whether an AOP is an affirmative agency action.

The *Grand Canyon* court agreed with the Bureau that the AOP was nothing more than a report to Congress and relevant Governors on past and projected Dam operations and, thus, was not an affirmative agency action. *Id.* at *9. In reaching its conclusion, the court examined the history of Dam operation decisions and the nature of AOPs. *Id.* at *11.

The Bureau operates the Dam using a water release system known as the "modified low fluctuating flow" or "MLLF." *Id.* at *1. The decision to use the MLLF approach was made when the Secretary of the Interior accepted the Bureau's Final Environmental Impact Statement recommendation by signing a Record of Decision in 1996. *Id.* at *13. Then, the Bureau formally established Operating Criteria for the Dam as required by Congress in the Grand Canyon Protection Act. *Id.* (referencing Pub. L. No. 102-575, 106 Stat. 4600, §§ 1801-1809). The Act also required the Bureau to "transmit to the Congress and to the Governors of the Colorado River Basin states a report . . . on the preceding year and the projected year operations undertaken pursuant to this Act. *Id.* at *11; *see also Grand Canyon Trust v. U.S. Bureau of Reclamation*, 691 F.3d 1008, 1018 (9th Cir. 2012), *as amended* (Sept. 17, 2012) (Bureau "is required by statute to prepare and submit an AOP each year").

The 2008 AOP at issue in *Grand Canyon* set forth projected releases from several reservoirs in the Colorado River Basin from October 2007 through September 2008. *Id.* at *14. The projections were based on "forecasted in-flows and the criteria established in the 1996 ROD and the Operating Criteria." *Id.* The actual releases from the Dam were governed by the MLFF flow regime adopted in the 1996 ROD and the Operating Criteria. *Id.*

The *Grand Canyon* court concluded that the AOP was not an affirmative agency action because it was merely an "educated guess" as to what the actual releases would be from the Dam for the following year. *Id.* at 15. The court explained that the plaintiff's "true complaint was with the use of the Bureau's MLFF system, a decision made in the ROD and Operating Criteria, not in the AOP." *Id.* In addition, the Bureau did not exercise discretion in the AOP that could benefit the humpback chub, an endangered species. *Id.* The Secretary's selection of MLFF in the ROD and the issuance of the Operating Criteria constrained the Bureau's discretion and "foreordain[ed] the use of MLFF in the AOP." *Id.*

The Ninth Circuit affirmed the Arizona District Court's conclusion that the AOP was not an affirmative agency action. *Grand Canyon Trust v. U.S. Bureau of Reclamation*, 691 F.3d 1008 (9th Cir. 2012), as amended (Sept. 17, 2012). In addition to concurring with the conclusion that the Bureau did not exercise discretion "that inures to the benefit of the chub" by preparing each AOP, the Ninth Circuit reiterated that "[i]t is truly the selection of MLFF as the operating criteria which creates the environmental effects of concern to the Trust" rather than the "agency's routine reporting in each AOP." *Id.* at 1021. Because the agency had complied with ESA consultation requirements before the Secretary chose MLFF, there was no ESA violation. *Id.* The Ninth Circuit concluded:

> Our decision on this is also pragmatically required. It is called for and legally required to permit environmental challenge under the ESA for want of consultation about an endangered or threatened species whenever the agency establishes material operating criteria for a dam, and when it embarks on a significant new direction in its operations. But to allow ESA challenge on an annual basis for each AOP would be unduly cumbersome and unproductive in addressing the substance of environmental issues. Annual challenges could not likely be resolved fully before the next AOP came along, and there is no benefit to endangered species in having an unending judicial process concerning annual reporting requirements that Congress mandated.

*Id.*

In *Shell Gulf*, the court considered whether oil response plans submitted by Shell and approved by the Department of Interior's Bureau of Safety and Environmental Enforcement ("BSEE") were the type of agency action that triggered ESA consultation. *Shell Gulf of Mexico v. Center for Biological Diversity, Inc.,* Case No. 3:12-cv-00048-RRB, Order on Summ. J. 34, ECF 159 (D. Alaska Aug. 5, 2013). The court concluded that the oil response plan approvals were not affirmative agency actions because they merely stated that the oil response plans met regulatory and statutory requirements. *Id.* Approval of the plans would not lead to any oil-spill-response activities because the BSEE does not have the authority to authorize any oil spill cleanup response. *Id.* Such authority lies with other agencies; therefore, the BSEE's action in approving the oil response plans would have no effect on listed species or critical habitat. *Id.*

This Court also considers *Karuk Tribe of California v. United States Forest Service*, 681 F.3d 1006 (9th Cir. 2012). In *Karuk*, the Ninth Circuit considered whether the Forest Service's approval of miners' Notices of Intent ("NOI") to operate mining activities constituted agency action triggering Section 7 consultation requirements. *Id.* at 1012-13. A miner who might cause disturbance of surface resources is required to submit a NOI to the appropriate District Ranger, who in turns notifies the miner within 15 days whether the NOI is approved or whether a more detailed plan is required. *Id.* at 1013. The Ranger requires a plan if, in his discretion, he determines that the operation will likely cause significant disturbance of surface resources. *Id.*

The Ninth Circuit held that, when the Forest Service approves a NOI, that approval constitutes an affirmative action for Section 7 purposes because it affirmatively authorizes mining activities. *Id.* at 1021. The Court rejected the argument that the Forest Service advised rather than authorized mining activities by approving a NOI. *Id.* at 1023. A NOI approval "marks the consummation of the agency's decision making process and is an action from which legal

consequences will flow." *Id.* (quoting *Hells Canyon Pres. Council v. U.S. Forest Serv.*, 593 F.3d 923, 930 (9th Cir. 2010)). The Court also rejected the argument that the underlying mining activities are authorized by the General Mining Law, rather than the agency's approval of the NOIs. *Id.* The Court explained that "private activities can and do have more than one source of authority, and more than one source of restrictions on that authority." *Id.* Finally, the Court rejected the notion that approval of a NOI was "merely a decision not to regulate the proposed mining activities." *Id.* Instead, the Court concluded that the Forest Service authorizes mining activities when it approves a NOI and affirmatively decides to allow the mining to proceed. *Id.*

Drawing lessons from *Grand Canyon, Shell Gulf,* and *Karuk*, this Court concludes that the EPA's approval of the TMDLs in this case was an affirmative action that triggered ESA § 7 consultation requirements. The Court respectfully disagrees with Judge Acosta that approval of a TMDL merely implements the criteria found in the water quality standards. The EPA's approval of the TMDLs changed the water quality standards. "[T]he higher numerical temperature criteria contained in the TMDLs effectively revised the Biologically-Based Criteria" and, therefore, revised the relevant water quality standard. *See* Summ. J. F&R 31-32. In other words, during the time period that the TMDLs were approved, 2004-2010, the Biologically-Based Criteria were the applicable water quality standard and, thus, the EPA's approval of the TMDLs is what allowed for higher temperatures. *Id.* at 26. This approval was affirmatively authorized by the EPA. As NWEA argues, "[b]ecause Judge Acosta found that the NCC-derived TMDLs are actually revised water quality standards and EPA was under a mandatory duty to consider them under CWA section 303(c), it necessarily follows that any EPA approval of the NCC-derived TMDLs is the functional equivalent of an approval under section 303(c), which indisputably triggers section 7 consultation." NWEA Obj. to Summ. J. F&R 23, ECF 140.

As in *Karuk*, the EPA's approval of TMDLs authorizes the state's implementation of pollution controls to proceed. In addition, just as the approval of NOIs in *Karuk* was enforceable by the Forest Service, the EPA's approval of a TMDL has binding legal effects and affects the entire CWA enforcement regime. Finally, just as the Forest Services' rules in *Karuk* require the agency to respond to a NOI and affirmatively act to approve or deny, the CWA requires the EPA to affirmatively approve or deny a state's TMDL within 30 days of submission. *See* 33 U.S.C. § 1313(d)(1)(D)(2).

*Grand Canyon* and *Shell Gulf* are distinguishable. In *Grand Canyon*, the court determined that the selection of MLFF, not the issuance of the AOP, created the environmental effects at issue. In contrast, here, the TMDL approval itself is what authorized the higher temperatures that allegedly would harm the listed species. As to *Shell Gulf*, the approval of oil response plans differs from the approval of TMDLs. The oil response plan approvals merely stated that the plans met regulatory and statutory requirements. In contrast, approval of the TMDLs changed the applicable water quality standards and, thus, is an affirmative act or authorization. Further, when the EPA approves a TMDL, "the state must incorporate the . . . TMDLs into its 'continuing planning process.'" *Pronsolino v. Nastri*, 291 F.3d 1123, 1128 (9th Cir. 2002). TDML approval has legal effects and is not merely a statement that it meets statutory requirements.

In sum, the Court concludes that, contrary to Judge Acosta's findings and recommendation, the EPA's approval of the TMDLs in this case was an affirmative action that triggered ESA § 7 consultation requirements.

///

**B. Judge Acosta correctly found that the EPA had some discretion to influence or change the activity for the benefit of a protected species.**

The next question is whether the EPA had "some discretion to influence or change the activity for the benefit of a protected species." *Karuk*, 681 F.3d at 1021. Judge Acosta concluded that the EPA had the requisite discretion to influence or change the activities in the TMDL for the benefit of a protected species. The Court agrees.

Judge Acosta explained that, because the NCC-Based Criteria contained in the TMDLs do not implement the applicable water quality standards, the EPA had the discretion to disapprove the TMDLs under 33 U.S.C. § 1313(d). Summ. J. F&R 36. Alternatively, if the NCC-Based Criteria set forth in the TMDLs revised the existing water quality standard, then the EPA had a duty to consult with regard to water quality standards and, thus, had the discretion to deny such water quality standards for the benefit of a protected species under 33 U.S.C. § 1313(c). *Id.*

The EPA objects to Judge Acosta's finding. The EPA argues that its authority to deny TMDLs because they are inconsistent with the applicable water quality standards, or any authority to deny them because do not comply with 33 U.S.C. § 1313(c), "is not tantamount to discretion to deny TMDLs for the benefit of listed species." EPA Obj. 6, ECF 138. Instead, "it is simply authority to deny the TMDLs because they do not meet CWA requirements." *Id.* The EPA argues that it had no legal authority to disapprove the TMDLs once it concluded that the TMDLs met the water quality standards and other requirements. Thus, ESA Section 7 procedures did not apply.

The parties appear to agree that the benchmark for approval of a TMDL is whether it is set at a level that will meet the applicable water quality standards. *See* 33 U.S.C. § 1313(d)(1)(C) (providing that a TMDL "shall be established at a level necessary to implement the applicable water quality standards with seasonal variations and a margin of safety which takes into account

any lack of knowledge concerning the relationship between effluent limitations and water quality."). However, they disagree about whether an assessment of the benefit of a TMDL's disapproval on ESA-listed species must be included in a determination of a TMDL's satisfaction of water quality standards.

NWEA's argument requires the Court to connect the dots between various parts of the CWA statute. First, as noted above, the EPA must determine whether a TMDL is established at a level necessary to implement the applicable water quality standards. 33 U.S.C. § 1313(d)(1)(C). "Standards," as used in the statute, includes both "criteria" and "designated uses." 33 U.S.C. § 1313(c)(2)(A)(water quality standard "shall consist of the designated uses of the navigable waters involved and the water quality criteria for such waters based upon such uses"); *see also Anacostia Riverkeeper, Inc. v. Jackson*, 798 F. Supp. 2d 210, 228 (D.D.C. 2011) ("subsection (1)(C)'s instruction to develop a TMDL protective of water quality standards is an instruction to determine the pollutant load level necessary to safeguard all designated uses"). Oregon's cold-water salmonids, many of which are listed as threatened and endangered under the ESA are relevant designated uses for temperature quality standards. *See* AR0465, AR0466; Or. Admin. R. 340-014-0028 ("The purpose of the temperature criteria in this rule is to protect designated temperature-sensitive, beneficial uses, including specific salmonid life cycle stages in waters of the State.").

Thus, according to NWEA, the CWA imposes upon the EPA a duty to determine whether a TMDL is established at a level necessary to implement water quality standards that do not negatively impact salmonids. The ability to approve the TMDL based on whether it implements standards as to threatened and endangered species is what gives the EPA the discretion to take action to benefit the listed species.

The EPA argues that it had no legal authority to disapprove the TMDLs once it concluded that the TMDLs met the water quality standards and other requirements. However, Judge Acosta found that the TMDLs did not meet the water quality standards. Because the TMDLs did not meet the water quality standards, the EPA had the authority to disapprove them. This authority is the basis for the EPA's discretion to take action by disapproving the TMDLs in order to implement water quality standards for the benefit of endangered or threatened species. Therefore, Judge Acosta correctly found that the EPA had discretion to change the activity for the benefit of a protected species.

   **C.  Judge Acosta correctly concluded that the EPA was required to make separate findings that each of the TMDLs had "No Effect" on the listed species.**

At summary judgment, the EPA argued that it was not required to consult with the Services on the TMDLs because it had determined that approval of the TMDLs in implementing the NCC would have "no effect" on listed species. Judge Acosta disagreed and the Court adopts his findings and recommendation as to this issue.

The ESA requires consultation when an agency's action is likely to result in jeopardy to protected species or critical habitat. 50 C.F.R. § 402.12(a). However, formal consultation is not required where the agency makes a determination the action will have no effect on the listed species. *Sw. Ctr. for Biological Diversity v. U.S. Forest Service*, 100 F.3d 1443, 1447 (9th Cir. 1996).

It is undisputed that the EPA made a "no effect" finding for the Willamette Basin TMDL, yet failed to engage in the same analysis in the subsequent TMDLs. Judge Acosta concluded that the "no effect" finding for the Willamette Basin TMDL did not automatically apply to all subsequent TMDLs, even if the analysis would have been similar or identical. Summ. J. F&R 44

("While the rationale of the Willamette Basin TMDL "no effect" finding may apply to the subsequent TMDLs, the EPA, not the court is obligated to engage in such analysis.").

The EPA objects to the F&R because it alleges that the stated rationale for the EPA's "no effect" determination for the Willamette TMDL and the Snake River-Hells Canyon TMDL applies equally to all TMDLs. At most, according to the EPA, its error was harmless.

Even if the EPA's analysis of the Willamette Basin TMDL would have applied to subsequent TMDLs, that is not for the Court to decide. The EPA's failure to document its decision as to the subsequent TMDLs deprives the Court from being able to review the decision and assess whether formal consultation was, in fact, unnecessary. *See, e.g.*, *Nat'l Wildlife Fed'n v. Fed. Emergency Mgmt. Agency*, 345 F. Supp. 2d 1151, 1175 (W.D. Wash. 2004) ("The lack of any documentation to support FEMA's 'no effect' determination precludes any judicial review of FEMA's apparent 'determination' and undermines the other Section 7(a)(2) consultation procedures that only allow an agency to avoid formal consultation through a biological assessment or a concurrence letter following informal consultation with FWS or NMFS.) (citing 50 C.F.R. § 402.14(b)(1)).

The EPA raises other objections it contends were raised in its summary judgment brief but not addressed by Judge Acosta. The Court has considered the EPA's additional objections and concludes that they do not form any basis by which to reconsider Judge Acosta's conclusion. In sum, the EPA was required to make separate findings that each of the TMDLs had "No Effect" on the listed species.

**D. Judge Acosta erred in concluding that the EPA fulfilled the consultation requirement by consulting on Oregon's 2004 water quality standards.**

Even if the EPA's approval of the TMDLs triggered Section 7 consultation because it was an affirmative agency action involving the exercise of agency discretion, Judge Acosta

found that the EPA satisfied the ESA's consultation requirement. According to Judge Acosta, "[a]gency approvals of actions that were contemplated in the prior approval of an action subject to an ESA consultation are subsumed within the prior consultation." Summ. J. F&R 39 (citing *Shell Gulf of Mexico, Inc. v. Ctr. for Biological Diversity, Inc.*, No. 1:12-CV-00010-RRB, 2013 WL 11311847, at *1 (D. Alaska Aug. 5, 2013), *rev'd and remanded on other grounds sub nom. Shell Gulf of Mexico Inc. v. Ctr. for Biological Diversity, Inc.*, 771 F.3d 632 (9th Cir. 2014)). The Court respectfully disagrees and declines to adopt this portion of Judge Acosta's F&R.

On February 4, 2004, the EPA issued a "Biological Evaluation of the Revised Oregon Water Quality Standards for Temperature, Intergravel Dissolved Oxygen, and Antidegradation" ("the NCC BiEv"). AR 464. In the NCC BiEv, the EPA discussed Oregon's proposed natural condition criteria (NCC) and concluded that "criteria based on natural conditions" was "fully protective of salmonid uses, even if the natural conditions are higher than the numeric criteria for some waterbodies, because river temperatures prior to human impacts clearly supported healthy salmonid populations." AR 464 at 25680. The EPA further concluded that the NCC "may affect, but is not likely to adversely affect" several species such as bull trout, Lahontan cutthroat trout, Oregon chub, Warner sucker, Lost River sucker, shortnose sucker, and Modoc sucker. *Id.* at 25681.

On February 24, 2004, the FWS issued a "Biological Opinion for EPA's Proposed Approval of Revised Oregon Water Quality Standards for Temperature, Intergravel Dissolved Oxygen, and Antidegradation" ("FWS BiOp"). AR 465. The FWS agreed with the EPA's conclusion as to the effect of the NCC on the "subject species." *Id.* at 25797. The FWS wrote: "We concur with EPA's determination of may affect, not likely to adversely affect the subject species. Natural conditions can create situations which are adverse to a species; however, the

extent of this adverse effect is not anticipated to cause significant harm or injury." *Id.* The NMFS

also agreed with the EPA's conclusion in its biological opinion issued on February 23, 2004

("NMFS BiOp"). AR 466.

Judge Acosta concluded that the FWS' and the NMFS' February 2004 biological

opinions satisfied the EPA's duty to consult under the ESA. According to Judge Acosta, "it is

clear both the EPA and the Services considered the possibility the NCC-Based Criteria would

exceed the Biologically-Based Criteria and would lead to adverse effects on listed species."

Therefore, Judge Acosta concluded that the subsequent approvals of TMDLs issued pursuant to

the NCC were covered by the ESA consultation on the NCC with FWS and NMFS and did not

require a second consultation.

NWEA objects to Judge Acosta's conclusion for two reasons: (1) NWEA contends that

there are no prior consultations on the NCC that could subsume consultation on the NCC-based

TMDLs because, in Judge Acosta's earlier Opinion in this dispute[2], Judge Acosta held that the

NCC was illegal and vacated the biological opinions from the prior consultation; and (2) even if

such prior consultation remained valid, it could not subsume the EPA's duty to consult on the

NCC-based TMDLs because the assumptions underlying the consultation were false and the

biological opinions were unlawful. *See Nw. Envtl. Advocates v. U.S. E.P.A.*, 855 F. Supp. 2d

1199, 1204 (D. Or. 2012).

The Court agrees with NWEA's first objection. The ESA Remedy Order vacated the

biological opinions from the prior consultation and, therefore, those opinions could not subsume

---

[2] The parties in this case have been involved in litigation over Oregon's water quality standards for many years. The first two cases resulted in the vacatur of major provisions of Oregon's water quality standards for temperature. *See Nw. Envtl. Advocates v. U.S. Envtl. Prot. Agency*, 268 F. Supp. 2d 1255 (D. Or. 2003) ("*NWEA I*"); *Nw. Envtl. Advocates v. U.S. Envtl. Prot. Agency*, 855 F. Supp. 2d 1199 (D. Or. 2012) ("*NWEA II*").

the need for consultation on the NCC-based TMDLs. *See* NWEA's Obj. Ex. B, Stipulated Order on Nonpoint Source and Endangered Species Act Remedies ("ESA Remedy Order"), ECF 140-1. Therefore, the EPA did not satisfy the ESA's consultation requirement.

**E. NWEA's sixth claim under the ESA is time-barred as applied to the Applegate, Walla Walla, and Sandy Basin TMDLs.**

In Claim 6, NWEA alleges that the EPA failed to consult with the Services before approving Oregon's temperature TMDLs. Sec. Am. Compl. 38, ECF 11. In addition to ruling against NWEA's sixth claim on the merits, Judge Acosta held it was time-barred by the six-year statute of limitations at 28 U.S.C. § 2401(a) as to the Applegate, Walla Walla, and Sandy Basin TMDLs. Summ J. F&R 11-15. The Court agrees with Judge Acosta.

The general civil action statute of limitations found in 28 U.S.C. § 2401(a) applies to actions brought against the federal government under the ESA. *Alsea Valley Alliance v. Evans,* 161 F. Supp. 2d 1154, 1160 (D. Or. 2001). Section 2401(a) provides that every civil action against the United States "shall be barred unless the complaint is filed within six years after the right of action first accrues." A right of action first accrues under § 2401(a) when an administrative action becomes final. *Crown Coat Front Co. v. United States*, 386 U.S. 503, 522 (1967).

Judge Acosta concluded that the action accrued when the EPA approved the TMDLs. Because more than six years passed from the approval of the Applegate, Walla Walla, and Sandy Basin TMDLs until the filing of the complaint, any ESA claims based on the approval of these TMDLs are time-barred. NWEA objects, arguing that the EPA's failure to consult is a continuing violation and, thus, each day the agency fails to act (consult) is a new violation and so the claim cannot be time-barred.

NWEA relies on *Institute for Wildlife Protection v. United States Fish and Wildlife Service*, No. 07-CV-358-PK, 2007 WL 4117978 (D. Or. Nov. 16, 2007) (F&R adopted by Judge Brown). In that case, the ESA required the FWS to designate critical habitat within a year after listing a species as endangered and perform status reviews of the listed species every five years. *Id.* at *1. Judge Brown found that the statute of limitations did not apply to claims alleging that FWS failed to perform a mandatory, statutory duty to designate critical habitat. *Id.* at *6. Judge Brown noted that "the statute of limitations was inapplicable because the plaintiff did not 'complain about what the agency has done but rather about what the agency has yet to do' in order to comply with its binding statutory duty to identify and to manage wilderness in the national park system." *Id.* (quoting *Wilderness Soc'y v. Norton*, 434 F.3d 584, 589 (D.C. Cir. 2006)). Judge Brown concluded that each day that FWS failed to designate critical habitat was a discreet, single violation of the ESA. *Id.*

NWEA argues that, similar to *Institute for Wildlife Protection*, its sixth claim does not challenge what the EPA has done (approve the TMDLs under the CWA), but what it has yet to do (consult under Section 7 of the ESA). NWEA cites several cases in which claims were based on alleged agency failures to take required action.

NWEA's objection is unavailing. NWEA's claim is premised on the allegations that the EPA affirmatively took action, through the exercise of its discretion, by approving Oregon's temperature TMDLs despite a failure to consult with the Services. The EPA's obligation to comply with the Section 7 consultation requirement is only triggered when making an affirmative act or authorization, such as approving the TMDLs. *See Karuk*, 681 F.3d at 1021. Thus, the statute of limitations began to run when the EPA approved the TMDLs, at which point Plaintiff could have initiated litigation on its claims. *See, e.g., Nw. Envtl. Advocates v. U.S. Envtl.*

*Prot. Agency*, 268 F.Supp.2d 1255, 1264 (D. Or. 2003) (finding that challenges to the EPA's failure to exercise discretionary duty "first accrued" when the EPA rejected state-submitted criteria); *Forest Guardians v. U.S. Forest Serv.*, 370 F. Supp. 2d 978, 984 (D. Ariz. 2004) (finding that cause of action accrued when agency issued permit); *Nw. Envtl. Advocates v. U.S. Envtl. Prot. Agency*, No. C14-196-RSM, Order on Motions to Dismiss, ECF 51 (W.D. Wash. July 2, 2015). Therefore, the Court adopts Judge Acosta's F&R to the extent he concludes three of the TMDLs at issue in NWEA's sixth claim are time-barred.

## III.    Claims 8-10: Voluntary Remand

The EPA moves to voluntarily remand the Klamath Basin temperature TMDL and the Willamette Basin mercury TMDL. The Court adopts Judge Acosta's recommendation to grant the motion, without vacatur, and impose a two-year remand timeline within which the EPA and Oregon must comply.

### A.  Klamath Temperature TMDL

In 2004, Oregon adopted and the EPA approved the NCC. In 2005, NWEA sued the EPA, challenging the validity of the NCC. *See NWEA II*, 855 F. Supp. 2d at 1199. In February of 2012, Judge Acosta struck down the validity of the NCC. *Id.* However, from 2004 to 2010, Oregon continued to submit temperature TMDLs, based on the NCC, and the EPA approved the TMDLs.

On December 21, 2010, Oregon submitted the Klamath TMDL. In May of 2012, the EPA issued a memorandum in which it postponed action on the TMDL until the issuance of a final order in *NWEA II*. The EPA never approved the Klamath TMDL and, on February 11, 2015, Oregon withdrew its submission of the TMDL.

NWEA's Claim 8 alleges that the EPA violated the CWA by failing to approve or disapprove the Klamath TMDL within 30 days of its submission by Oregon. OWQSG argues

that NWEA's claim regarding the Klamath TMDL is moot because the EPA cannot approve or disapprove the TMDL, given that Oregon withdrew its request for the EPA's approval. Accordingly, OWQSG contends that Claim 8 is moot because the requested relief cannot be granted.

OWQSG also objects to the form of relief granted—an order that the EPA and Oregon submit a revised Klamath TMDL within two years of the adoption of the F&R. QWQSG argues that the EPA has no authority under the CWA to establish a TMDL until and unless it has disapproved a TMDL submitted by the state. *See* U.S.C. § 1313(d)(2). In addition, Oregon has no obligation to establish and submit the TMDL within any specific schedule and NWEA did not seek any relief against Oregon in its Second Amended Complaint.

Oregon and the EPA do not object to the F&R, nor do they respond to OWQSG's objections. NWEA, however, does respond. NWEA originally opposed the EPA's motion for voluntary remand. *See* ECF 100. However, NWEA is satisfied with Judge Acosta's decision because the "proposed timeline for new TMDLs undoubtedly represents a significant benefit to the environment." NWEA Resp. to OWQSG Obj. 3, ECF 145.

This Court concludes that Judge Acosta's F&R provides a practical and reasonable solution to the fact that this TMDL has been in limbo for over six years. Accordingly, the Court adopts this portion of the F&R.

B.  Willamette Basin Mercury TMDL

Judge Acosta also recommends remanding the Willamette Basin TMDL and imposing a two-year deadline for Oregon and the EPA to revise the TMDL. No party objects to this part of the Voluntary Remand F&R. The Court has reviewed the F&R and, finding no error in this portion, adopts Judge Acosta's recommendation. Furthermore, the Court declines to strike Judge

Acosta's recitation of the law as stated in *Anacostia Riverkeeper*, 798 Supp. 2d at 224, as requested by OWQSG.

**IV.  Miscellaneous Issue**

NWEA requests that the Court make three minor changes to the Summary Judgment F&R because Judge Acosta cites to an incorrect provision of the CWA. According to NWEA, pages 28 and 31 of the F&R contain citations to 303(d)(1)(D) that should instead be citations to 303(d)(1)(C). NWEA Obj. 43, ECF 140. The EPA agrees. EPA Resp. 33, ECF 143. No other party responds. Therefore, the Court grants NWEA's request to make those changes.

**CONCLUSION**

The Court ADOPTS IN PART Magistrate Judge Acosta's Summary Judgment F&R [132]. NWEA's motion [78] for summary judgment is granted with regard to Claims 1, 2, 6, and 7, with the exception of NWEA's Claim 1, 6, and 7, based on TMDLs approved by the EPA prior to September 27, 2006; and denied as moot with regard to Claims 3, 4, and 5. The EPA's cross motion [88] for summary judgment and Intervenor-Defendants' cross motions [92], [95], and [96] for summary judgment joining in the EPA's cross-motion, are denied in all respects except as to NWEA's Claim 1, 6, and 7, to the extent it is based on TMDLs approved by the EPA prior to September 27, 2006.

The Court ADOPTS Magistrate Judge Acosta's Voluntary Remand F&R [133]. The EPA's motion [89] for voluntary remand is granted. During the remand period, the Willamette Mercury TMDL should be left in place. The EPA and Oregon must submit a revised Willamette mercury TMDL and Klamath temperature TMDL within two years of the date below.

Plaintiff shall prepare an appropriate Judgment consistent with this Order, and after conferring with counsel for Defendants and Intervenors, shall submit it to the Court for signature

within 30 days of the date below. If the parties cannot agree on a Judgment, they should notify this Court's Courtroom Deputy, who will schedule a telephone conference.

IT IS SO ORDERED.

DATED this _____ day of _____ , 2017.


_____
MARCO A. HERNÁNDEZ
United States District Judge