UNITED STATES DISTRICT COURT
DISTRICT OF OREGON
PORTLAND DIVISION

| | | |
|---|---|---|
| NORTHWEST ENVIRONMENTAL ADVOCATES, a non-profit corporation, | ) ) ) | Civil No.: 3:12-cv-01751-AC |
| Plaintiff, | ) ) | |
| v. | ) ) ) | |
| UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, a United States Government Agency, | ) ) ) ) | **DECLARATION OF DANIEL D. OPALSKI IN SUPPORT OF EPA'S BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON REMEDY** |
| Defendant, | ) ) ) | |
| and | ) ) | |
| STATE OF OREGON; OREGON WATER QUALITY STANDARDS GROUP; THE FRESHWATER TRUST | ) ) ) ) | |
| Intervenors-Defendants. | ) ) ) | |

I, Daniel D. Opalski, based on my personal knowledge, state:

1.      I am the Director of the Office of Water and Watersheds for Region 10 of the U.S.

Environmental Protection Agency ("EPA" or "Agency"). I have been in this position since

October 2012. I have worked at EPA for approximately 31 years. Prior to my current position I

was Director of Region 10's Office of Environmental Cleanup for approximately 8 years, and I

served as Director of Region 10's Oregon Operations Office for 5 years prior to that. In my current

position, I lead an office of approximately 70 staff and managers who directly implement and/or

1   oversee implementation by states and tribes of the majority of the federal Clean Water Act (CWA)

2   programs and federal Safe Drinking Water Act programs across the states of Alaska, Idaho, Oregon

3   and Washington.

4   **A.      EPA's Obligations Related to Total Maximum Daily Load Development and**
        **Implementation**

5
6       2.       The matters addressed in this lawsuit are matters handled by the Watershed Unit

7   within my office. The Watershed Unit has 10 full-time staff. Their responsibilities include

    overseeing implementation of the Total Maximum Daily Load (TMDL) programs in the Region 10
8
    states of Alaska, Idaho, Oregon, and Washington. This oversight involves review and approval or
9
    disapproval of TMDLs submitted by the states. Our oversight responsibility also includes review
10
    and either approval or disapproval of lists of impaired waters (called 303(d) lists) from each state
11
    every other year and providing grant and oversight support to the Region 10 jurisdictions' non-point
12
    source programs that help achieve TMDL-identified pollutant reductions from non-point sources
13
    under CWA section 319. We are also responsible for overseeing implementation of the Coastal
14
    Zone Management Act in Oregon and Washington. In addition, the Watershed Unit oversees
15
    implementation of CWA section 106 and CWA section 319 programs for eligible tribes in the
16
    Region.
17
        3.       In addition to programmatic responsibilities arising directly from the Clean Water
18
    Act, the Watershed Unit has responsibilities arising out of TMDL and other litigation involving the
19
    Region 10 states. EPA Region 10 has state-wide TMDL obligations "backstopping" state
20
    completion of required numbers of TMDLs pursuant to a settlement agreement in Washington and
21
    pursuant to a court order in Alaska. In addition to these "backstop" obligations the Region has a
22
    number of litigation-related commitments. The Watershed Unit is already supporting the Oregon
23
    Department of Environmental Quality (ODEQ) as it works to develop the Klamath River
24
    Temperature TMDL and Willamette Mercury TMDL, in accord with the Court's order in this case.

1    These two TMDLs alone will consume several hundreds of thousands of dollars in contractor

2    resources provided by EPA Headquarters.  Because of ongoing litigation and previous

3    commitments, EPA Region 10 is preparing a temperature TMDL for the Columbia and Lower

4    Snake Rivers.  This TMDL requires EPA to work with Idaho, Oregon, Washington, and affected

5    Tribes in the development of a very large geographic scale TMDL (including Oregon waters

6    impaired for temperature).

7        4.    The Watershed Unit is required to perform all of the activities described in the above

8    two paragraphs, either by the Clean Water Act or by Court Orders, Consent Decrees, or Settlement

9    Agreements stemming from previous litigation.  My office has no discretion to abandon or

10   deprioritize any of these activities.  Region 10 also has several unresolved cases in litigation

11   representing large potential TMDL obligations regarding PCB impairments in the Spokane River,

12   Washington (WA), turbidity impairments in the Hangman Creek (WA), and multi-pollutant

13   impairments in the Deschutes River (WA).

14       5.    The Clean Water Act envisions that states will develop, issue, and implement

15   TMDLs, with EPA providing funding and support for development and approval or disapproval of

16   submitted TMDLs.  Working relationships, roles, and responsibilities between EPA and its state

17   partners are documented in Performance Partnership Agreements (PPAs).  In the PPA[1] between

18   EPA and ODEQ, the parties commit to working together on jointly established goals for state-

19   delegated Clean Water Act programs.  The PPA includes a list of several "priority" TMDLs to be

20   developed, most of which require EPA funding and technical support, as well as specific outcomes

21   expected from EPA program funds awarded to the state.  Discussions on priority order of TMDLs

22   include aspects such as how long the waterbody has been impaired, the degree to which impairment

23

24   [1] The 2016-2018 PPA can be found at http://www.oregon.gov/deq/about-us/Pages/ppa.aspx with
     other information on PPA commitments.

DECLARATION OF DANIEL D. OPALSKI - 3
Civil No. 3:12-cv-01751-AC

1    is preventing a designated use from being attained, what other pollutants are causing or contributing

2    to impairments for that waterbody, and when the point source permits in that waterbody are up for

3    reissuance.  The PPA is revised biannually and the completion of "priority" TMDLs are also

4    reported nationally as part of the measures developed by EPA and the States in 2013.[2]  [See

5    Declaration of Eugene Foster.]

6    **B.       Development of Replacement Temperature TMDLs**

7           6.       The process of developing a TMDL, whether by a State or by EPA, is complex and

8    time-consuming.  First, the agency generally conducts monitoring for each of the pollutants

9    addressed by the TMDL.  In Oregon, modeling is used in the preparation of nearly all TMDLs to

10   identify critical conditions, assess source contributions, and quantify the potential impacts of

11   treatment and/or restoration measures.  For each TMDL, the model must be updated with current

12   site-specific information and calibrated to ensure its predictive value.  Load allocations and

13   wasteload allocations are then assigned.  The TMDLs must include reasonable assurances that the

14   load allocations will be met and provide for a margin of safety to account for a lack of information.

15   EPA does not have the authority to issue or approve implementation plans, but Oregon develops

16   implementation plans (Water Quality Management Plans) for all of its TMDLs, as required under its

17   own state regulations.[3]  The WQMP, along with the Designated Management Agency's TMDL

18   Implementation Plans that are also required by the state's regulation, provide much greater

19   specificity than the TMDL about how load allocations may be achieved.  From the point at which

20

21

22   [2] These measures are described in the EPA document "A Long-Term Vision for Assessment,
     Restoration and Protection under the Clean Water Act Section 303(d) Program."  The most recent
23   guidance for the National Water Program for FY18-FY19 refers to these reporting measures
     (https://www.epa.gov/sites/production/files/2017-09/documents/fy18-19-ow-npm-guidance.pdf).
24   [3] OAR 340-042-0040(3)(l) Establishing Total Maximum Daily Loads (TMDLs) and OAR 340-042-
     0080 Implementing a Total Maximum Daily Load.

DECLARATION OF DANIEL D. OPALSKI - 4
Civil No. 3:12-cv-01751-AC

1    monitoring and data gathering begins, it is not uncommon for the development of a TMDL to take

2    three to five years.

3        7.    In general, EPA provides technical, policy, and contractor support to the state in the

4    development of complex or highly visible TMDLs.  Senior EPA regional staff are assigned to work

5    with ODEQ's TMDL lead staff, participating in regular meetings and conference calls at all stages of

6    TMDL development.  EPA attempts to anticipate any policy or technical issues that may affect the

7    approval process and will confer regularly with ODEQ to address these issues.  When contractor

8    support is provided, usually for modeling or data analysis, EPA staff must direct the federal

9    contractor's work.  EPA carefully reviews draft TMDLs and provides official comments on the

10   TMDL during Oregon's public comment process.  When Oregon submits the TMDL to EPA for

11   review and approval or disapproval, EPA staff reviews the TMDL, including the comment-response

12   document.  If staff recommends that the TMDL be approved, the staff must prepare an approval

13   memorandum for the record and an official approval letter for signature by the Office Director.

14   Following the issuance of the approval letter, EPA staff assembles the administrative record that

15   provides the basis for approval of the TMDL.

16       8.    In order to replace the existing Oregon temperature TMDLs, both EPA and ODEQ

17   intend that the working arrangement described above will be followed for development of any

18   replacement temperature TMDLs.  We have conferred with ODEQ on the mechanics and proposed

19   schedule for replacement, as described in the Declaration of Eugene Foster.  We believe that the

20   proposed schedule of twelve years is a reasonable schedule, given the work involved and the

21   competing priorities for both agencies.

22   C.   Challenges in Replacing the Temperature TMDLs

23       9.    EPA recognizes when the TMDLs are replaced, the replacements must be legally

24   sound.  Since the February 2012 ruling from Judge Acosta on Oregon Water Quality Standards and

DECLARATION OF DANIEL D. OPALSKI - 5
Civil No. 3:12-cv-01751-AC

1   since NWEA's subsequent lawsuit on temperature TMDLs filed in September 2012, EPA and

2   ODEQ have invested hundreds of hours on investigating, describing, and evaluating a variety of

3   approaches for addressing the program impacts in water quality standards, TMDLs, and permits, as

4   a direct result of the invalidation of the natural conditions criteria (NCC). These efforts have

5   highlighted that replacing the TMDLs is a tremendous effort with no commensurate environmental

6   benefit.

7           10.      The most legally and technically sound approaches to addressing the TMDL defects

8   stemming from the invalidation of the NCC are also the most resource-intensive. The TMDLs at

9   issue identify waters that are naturally warmer than the applicable BBNC at times, which creates

10  significant challenges to the use of the BBNC as the applicable standard. This circumstance could

11  be addressed by development of site-specific criteria (SSC) for these waters. Such SSCs would

12  require additional modeling to identify criteria that are representative of natural conditions and that

13  include the complex array of natural variation that supports the uses. Prior to taking final action on

14  the SSC, EPA would have to consult with National Oceanic and Atmospheric Administration

15  (NOAA) and U.S. Fish and Wildlife Service (USFWS) on the potential effects of the action on listed

16  species and their critical habitat areas pursuant to Section 7 of the Endangered Species Act. The

17  time and effort to prepare, consult on, promulgate, and approve these SSCs by EPA, ODEQ,

18  NOAA, and USFWS would be considerable. But in the end, as described in the Declarations of

19  John Palmer, Jennifer Wu, and Ben Cope, new TMDLs based on these SSCs would limit the

20  cumulative anthropogenic contribution of heat to the human use allowance (HUA) of 0.3 degrees

21  Celsius, divided among all contributing point and nonpoint sources, and employ surrogate measures,

22  such as shade targets for full natural vegetation, and other features that cool streams, the same

23  actions called for in the existing TMDLs. In short, replacing the NCC with new SSCs and basing

24  new TMDLs on those new criteria would result in TMDLs that look very much like the ones being

1  replaced.  Other standards options could include development of new state-wide water quality
2  standards.  Doing so would involve many of the same procedural and regulatory steps of the SSC
3  approach, but with some economies from fewer individual actions.  And again, a new standard
4  would not result in any appreciable differences in the load or wasteload allocations in the TMDLs.
5  Those would still be determined by the HUA and surrogate measures calling for full restoration of
6  natural conditions.

7      11.      The Oregon temperature TMDLs affected by the invalidation of the NCC should be
8  replaced eventually, as part of the regular application of the Clean Water Act's processes.  EPA has
9  already taken the step of proposing to add the waters affected by the invalidation of the NCC to
10 Oregon's 2012 303(d) list of impaired waters.[4]  EPA has proposed to add these waters to Category 5.
11 This category identifies impaired waters for which a TMDL is necessary.  Placement of these waters
12 in Category 5 of the 303(d) list will identify them as requiring new or revised TMDLs without
13 invalidating the existing TMDLs.  It will not prioritize them above other waters in Category 5, but
14 will preserve ODEQ's ability to make decisions about the priority order for their completion while
15 allowing implementation of existing TMDLs to continue.

16      I declare under penalty of perjury that the foregoing is true and correct.

17      Signed this ___16 +h___ day of February 2018.

18                                        Daniel D. Opalski

19

20

21

22

23  _____
[4] EPA's proposed action on Oregon's 2012 303(d) list can be found at
24  https://www.epa.gov/tmdl/partial-approval-and-partial-disapproval-oregon-2012-303d-list,
    including a list of the waters proposed to be added.

DECLARATION OF DANIEL D. OPALSKI - 7
Civil No. 3:12-cv-01751-AC