BROOKS M. SMITH, VSB # 40171, *admitted pro hac vice*
Troutman Sanders LLP
1001 Haxall Point
Richmond, VA 23218
Telephone: (804) 697-1414
Email: brooks.smith@troutmansanders.com

Jasmine C. Hites, OSB# 104056
Troutman Sanders, LLP
100 SW Main St., Suite 1000
Portland, OR 97204
Telephone:  (503) 290-2344
Email: jasmine.hites@troutmansanders.com

Joseph A. Furia, OSB # 083282
Landye Bennett Blumstein LLP
1300 SW 5th Avenue, Suite 3600
Portland, OR 97201
Telephone:  (503) 224-4100
Email: jfuria@lbblawyers.com

Attorneys for The Freshwater Trust

UNITED STATES DISTRICT COURT
DISTRICT OF OREGON
PORTLAND DIVISION

| | |
|---|---|
| **NORTHWEST ENVIRONMENTAL ADVOCATES**, a non-profit corporation,<br><br>**PLAINTIFF**,<br><br>v.<br><br>**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,** a United States Government Agency,<br><br>**DEFENDANT**,<br><br>and<br><br>**STATE OF OREGON**; **OREGON WATER QUALITY STANDARDS GROUP**; and **THE FRESHWATER TRUST**<br><br>**INTERVENOR-DEFENDANTS** | Case No.: 3:12-cv-01751-AC<br><br>THE FRESHWATER TRUST'S BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON REMEDY |

## INTRODUCTION

The Freshwater Trust ("TFT") intervened as a defendant in this litigation because the watershed-scale information and analyses contained in the total maximum daily loads ("TMDLs") established by the Oregon Department of Environmental Quality ("DEQ"), approved by the U.S. Environmental Protection Agency ("EPA") and challenged by Plaintiff Northwest Environmental Advocates ("NWEA") are vital to TFT's mission of preserving and restoring freshwater ecosystems in Oregon, and to TFT's ongoing efforts to accelerate the pace and scale of restoration in those watersheds through innovative tools like water quality trading. The fact that this Court found error in EPA's approval of the TMDLs does not negate the value of those TMDLs as "blueprints" to guide restoration activities and prioritize projects with the highest potential to significantly reduce temperature.

Vacating the TMDLs will do more harm than good, disrupting restoration efforts and depriving interested stakeholders like TFT of the many valuable pieces of the TMDLs that have nothing to do with the errors this Court identified. For these reasons, TFT joins EPA in opposing vacatur and the injunctive relief requested by NWEA. TFT adopts and incorporates EPA's arguments by reference, and respectfully submits this brief to highlight the disruptive consequences of vacatur.

## ARGUMENT

I. <u>The TMDLs should not be vacated</u>.

The Ninth Circuit has adopted a two-part test for determining whether an agency's action should be vacated. Under that test, a court should consider "how serious the agency's

errors are 'and the disruptive consequences of an interim change that may itself be changed.'" *Cal. Cmtys. Against Toxics v. EPA*, 688 F.3d, 989, 992 (9th Cir. 2012) (quoting *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n,* 988 F.2d 146, 150-51 (D.C. Cir. 1993)). A court's decision whether to require vacatur is controlled by principles of equity. *Nat'l Wildlife Fed'n v. Espy*, 45 F.3d 1337, 1343 (9th Cir.1995).

        A.    <u>From an environmental protection perspective, EPA's errors were not serious.</u>

The errors that this Court assigned to EPA in its approval of the TMDLs all relate back to an earlier decision invalidating the natural conditions criteria ("NCC") on which the TMDLs were based. *Nw. Envtl. Advocates v. EPA*, 855 F.Supp. 2d 1199 (D. Or. 2012) ("*NWEA II*"). In effect, the TMDLs became the fruit of the poisonous tree from a legal perspective.

For its liability analysis, the Court compared the numeric calculations of the NCC that had been used in the TMDLs against separate biologically-based numeric criteria ("BBNC") that were upheld in *NWEA II* and determined that, at least on their face, those calculations were not consistent with the BBNC. *NWEA II*, 855 F. Supp. 2d 1217-18; Nw. *Envtl. Advocates v. EPA,* No. 3:12-cv-01751-AC, 2017 WL 1370713 (D. Or. April 11, 2017) ("Order") (ECF No. 149), at 3 (adopting portions of the Findings and Recommendation (ECF No. 132) discussing the same). On that basis, the Court ruled that EPA erred in approving the TMDLs, and also erred in not treating the numeric calculations of the NCC as new or revised water quality criteria under Section 303(c) of the Clean Water Act, or determining whether

those criteria required consultation under Section 7 of the Endangered Species Act. Order, at 3, 12-13.

Without question, invalidation of the NCC affects the TMDLs in a manner that compels remand. However, to understand whether EPA's errors were serious for purposes of equitable balancing on remedy, the Court must look beyond the NCC and BBNC to the human use allowance ("HUA"), which was upheld in *NWEA II* and used in the TMDLs, as well. *NWEA II*, 855 F.Supp. 2d at 1217, n.8.

As EPA explained in its brief, the TMDLs limit temperature increases caused by all anthropogenic sources cumulatively to a total of not more than 0.3º C above the applicable criterion at a "point of maximum impact" ("POMI"), as required by the HUA. Oregon Administrative Code (OAR) § 340-041-0028(12)(b)(B). Importantly, this same 0.3º C cap would apply whether the TMDLs were written to meet the NCC, the BBNC, or any other applicable criteria. *Id.*

Viewed in the context of the HUA, EPA's errors were not so serious as to warrant vacatur. The HUA sets a cap within the TMDLs that protects against any environmental harm from anthropogenic sources, and this same cap will need to be applied in any new or revised TMDLs on remand, *even if* those TMDLs are written to meet the BBNC.

Moreover, EPA's errors only go to those aspects of the TMDLs that used or relied on the NCC-based calculations. As noted above, the load allocations and wasteload allocations for anthropogenic sources did not use or rely on those calculations. The TMDLs also embody important information and analyses wholly divorced from the NCC-based calculations.

For example, the TMDLs provide vitally important information on where the temperature exceedances are the most severe, the sources of those exceedances, and options for addressing those exceedances, including quantified comparisons; they provide in-depth analyses of current riparian vegetation conditions and how revegetation with accompanying shade could mitigate the exceedances; they evaluate channel morphology and complexity and identify measures for providing or enhancing cold water refugia; and they comprehensively address other watershed dynamics that influence impairment and attainment of water quality criteria (regardless of which criteria are applied).

For illustration purposes, in the Rogue River Basin TMDL, DEQ identified the season of impairment for the waterbody (TMDL at 2-14), which helps on-the-ground practitioners like TFT identify the best set of restoration actions to install in order to offset those impacts. After assessing the cumulative impact of point source discharges (*Id.* at 2-15), DEQ then identified a POMI for temperature. *Id.* at 2-16 to 2-18. This POMI helps practitioners focus their on-the-ground efforts so that the benefits of restoration are maximized.

The TMDL also connected water quality trading eligibility to the POMI. *Id.* at 2-60. With the POMI identified, DEQ performed the "cumulative effects analysis" necessary to create watershed-based allocations of the HUA for point and nonpoint sources. *Id.* at 2-53 to 2-61. Among these allocations was the wasteload allocation given to the City of Medford, thereby establishing the size of its temperature reduction obligation. *Id.* at 2-57.

After identifying the problems and the points at which they were the most acute, DEQ then completed a detailed analysis of the nonpoint source causes of heat loading—near-stream

vegetation disturbance/removal; channel modifications and widening; hydromodification by dams, diversions, and irrigation districts; hydromodification through water rights; and other anthropogenic sources. *Id.* at 2-18 to 2-28. Of particular importance to TFT, in response to its identification of near-stream vegetation disturbance and removal as a key limiting factor, DEQ identified "effective shade curves" for the whole basin, which represent the maximum possible effective shade for a given vegetation type. *Id.* at 2-40. Shade curves were carefully derived for different vegetation types based on channel width, and account for latitude, critical period, site elevation and stream aspect. *Id.* TFT uses the vegetation height and density information assembled in the TMDL when determining how best to plant restoration sites in the basin; in addition, these assumptions are plugged into the model used to calculate credit values from water quality trading sites. Declaration of Joe Whitworth ("Whitworth Decl."), ¶ 5.

The TMDL also identified the formula necessary to convert heat load into kilocalorie ("kcals") per day units (*Id.* at 2-29), which made it possible for TFT to similarly value the benefits of restored shade-producing trees in the same units. In addition to shade analysis, the TMDL also noted that temperature impacts can be caused by direct modification to stream channels, including changes to channels from road building, flood control, gravel extraction or channel realignment. *Id.* at 2-19 to 2-21. The identification of these impacts helped TFT target instream activities in addition to the riparian revegetation work completed as part of the City of Medford's TMDL-based temperature trading program. Whitworth Decl., ¶ 6.

Other challenged TMDLs go even further with this kind of information and analysis. For example, the John Day TMDL identified narrative surrogate measures to restore natural

Page 6 – TFT'S BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT ON REMEDY

channel form in terms of sinuosity, complexity, floodplain connectivity, and cross-sectional dimension. Declaration of John Palmer (ECF No. 163), ¶ 33. TFT also works in the John Day Basin, and has relied upon this analysis as a key source in determining where and what kinds of projects to install. Whitworth Decl., ¶ 17.

*All* of these aspects of the TMDLs are valuable for TFT's on-the-ground restoration work, enabling TFT to target areas and practices that have the greatest and most durable impact on improving water quality. *None* of these aspects of the TMDLs are affected by EPA's errors, but if the TMDLs are vacated, then these benefits will be lost, like the proverbial baby thrown out with the bath water.

The overarching benefits of the TMDLs are more than just theoretical to TFT. They are vital to TFT's on-the-ground restoration efforts. For example, in the Rogue River Basin, the TMDL identified the key factors contributing to the temperature impairment, including a lack of riparian vegetation and instream habitat. *See* Rogue River Basin TMDL, A.R. Docs. 282-289, Chapter 2.4, Fig. 2.5; Rogue River Basin TMDL WQMP, Chapter 4, at 4-12, Fig. 4.5 (Pollutant sources and example management strategies to address temperature: "increase effective shade through riparian restoration and protection; restore natural stream channel hydrology; increase stream flow."). The TMDL also identified wasteload allocations for point sources (including the City of Medford) based on the cumulative HUA analysis at the POMI, *not* the NCC or calculations derived from the NCC. Rogue River Basin TMDL, Chapters 2.8, 2.9. To facilitate implementation, the TMDL included a methodology for converting the allocation targets into a kilocalorie per day approach. *Id.* at Chapter 2.5.

Page 7 – TFT'S BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON REMEDY

Over the last five years, TFT has followed the blueprint of the Rogue River Basin TMDL to significant positive effect.  Whitworth Decl., ¶ 7.  To date, TFT has implemented a number of new riparian revegetation projects that improve the riparian and aquatic habitat as well as generate thermal benefits for tributaries and rivers in the Rogue River Basin. The restoration projects for the City of Medford have resulted in 24,026 new linear feet of streamside restoration, which block 419,610,444 kcals/day of solar load from hitting tributaries and rivers in the Rogue River Basin.  *Id.* at ¶ 8.  By 2022, TFT has a contractual commitment to the City of Medford (one of the point sources subject to the wasteload allocations in the TMDL) to build enough projects to ensure that the City's 600 million kcals/day reduction obligation has been satisfied.  *Id.* at ¶ 9.

TFT's experience with Medford is strong evidence of the importance of the TMDLs in promoting on-the-ground progress.  TFT's contractual work for the City has enabled TFT to leverage additional restoration opportunities in the watershed.  For example, TFT has helped drive $4.75 million in Bureau of Reclamation funding into the Rogue River Basin for instream habitat restoration and upland revegetation work that is consistent with the technical analyses and priorities identified in the TMDL.  *Id.* at ¶ 11.  In addition, TFT is now under contract with the Oregon Department of Transportation and the U.S. Bureau of Land Management to help recruit and implement projects that align with the needs and priorities identified in the TMDL.  *Id.* at ¶ 12.  TFT is also using Oregon Watershed Enhancement Board ("OWEB") funds to create non-credit additions to City of Medford-funded, TMDL-driven credit projects. OWEB

was identified by DEQ under the reasonable assurance analysis outlined in the water quality management plan for the TMDL. *Id.* at ¶ 13.

In total, these efforts have led to 21 project sites across the Rogue River Basin benefiting spring and fall Chinook salmon, winter and summer steelhead, coho salmon, and Pacific lamprey—the very species affected by warmer waters, which led to the impairment listing and ultimately the temperature TMDL. *Id.* at ¶ 14. Through 2016, more than 25,000 feet of stream has been protected, 87,825 native trees and shrubs have been planted, 1,459 feet of side channel has been restored, and 137 large wood structures installed. *Id.* at ¶ 15. Not including 2017 benefits, quantifying the environmental benefit of these actions translates to 437,921,017 kcals/day in blocked solar load. In addition to these thermal benefits, these activities also reduce runoff, resulting in 51 pounds/year of reduced phosphorus loading, 594 pounds/year in reduced nitrogen loading, and 107,949 pounds/year of reduced sediment loading. *Id.* at ¶ 16.

For any of TFT's restoration efforts to happen at scale, ideally there would be predictable demand for restoration projects and a sufficient supply of labor to fulfill that demand. *Id.* at ¶ 18. A TMDL helps to create that demand and support that work. *Id.* The local restoration capacity created in response to the watershed-scale information and analyses in the TMDL has resulted in a scaled up restoration economy in the Rogue River Basin that did not exist before the TMDL (and that would not exist without it). *Id.* at ¶ 19. Published research by Max Nielsen-Pincus and Cassandra Moseley shows that between 16 and 23 local jobs are supported in Oregon for every $1 million spent on restoration. Max Nielsen-Pincus &

Page 9 – TFT'S BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT ON REMEDY

Cassandra Moseley, *The Economic and Employment Impacts of Forest and Watershed Restoration*, 21(2) RESTORATION ECOLOGY 207, 207-214 (2013).  Riparian, or streamside, restoration projects, which tend to involve labor-intensive planting and fencing, support the most jobs and wages.  In addition to jobs, this money has a multiplier effect: every dollar spent in Oregon for restoration results in an additional 1.7 to 2.6 times the amount of economic activity.  *Id.*  This level of activity—engaged contractors who can sustain their work over time, a supply chain that can scale—is in direct response to the needs identified in the TMDL, and the partnerships and stakeholder efforts facilitated by the TMDL process.

> B. <u>Vacatur would lead to other disruptive consequences</u>.

TMDLs serve as the centerpiece of the water quality continuum under Section 303 of the Clean Water Act, which requires states to adopt and periodically revise their water quality criteria, assess the condition of their waters against those criteria, list waters that are impaired (i.e., not meeting criteria), and then establish TMDLs to address the impairment.  33 U.S.C. §§ 1313(c), 1313(d).  TMDLs are "primarily informational tools" that "serve as a link in an implementation chain that includes federally regulated point source controls, state or local plans for point and nonpoint source pollutant reduction, and assessment of the impact of such measures on water quality, all to the end of attaining water quality goals for the nation's waters."  *Pronsolino v. Nastri*, 291 F.3d 1123, 1129 (9th Cir. 2002).  "TMDLs are not self-implementing," but serve as "informational tools utilized by EPA and the States to coordinate necessary responses to excessive pollution in order to meet applicable water quality standards."  *Anacostia Riverkeeper, Inc. v. Jackson*, 798 F. Supp. 2d 210, 216-17 (D.D.C.

Page 10 – TFT'S BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT ON REMEDY

2011) (noting that "a TMDL provides crucial information for federal, state and local actors in furtherance of the cooperative efforts to improve water quality envisioned in the [Clean Water Act].").

TMDLs are the only tool available under the Clean Water Act that allow EPA, states and stakeholders to comprehensively and systematically assess pollution on a watershed-basis, as compared to the source-specific permitting programs in Sections 401, 402 and 404 of the Act. TMDLs serve as blueprints that identify the myriad sources, causes and locations of impairment, and assign targets to each source (or source sector) for reductions needed to restore water quality; targets that can then be incorporated into more authoritative documents like permits and management plans. 40 C.F.R. § 130.7. TMDLs have no statutorily-limited duration and thus provide continuity beyond the typical three-year planning horizon for state review of water quality standards, or the five-year permit term for most source-specific discharge permits. They also serve as a catalyst for funding, including the prioritization of grant funding under Section 319 of the Act, and a means for prioritizing Clean Water Act State Revolving Fund loan disbursements under Section 212 of the Act.

Last, but surely not least, the TMDL process serves to convene, inform and mobilize interested stakeholders. Often, years of outreach to, and collaboration with, stakeholders are needed to establish a TMDL. This outreach and collaboration is critically important, not just for procedural correctness, but to inform local residents about water quality problems in their watershed and to elicit ideas on acceptable means and measures to address those problems. This level of engagement ensures that local stakeholders' interests are adequately represented,

Page 11 – TFT'S BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON REMEDY

their knowledge is incorporated into the TMDL, and they have a vested stake in seeing the TMDL's goals achieved. Vacating the TMDL risks alienating local stakeholders across the state and undermining future TMDL outreach efforts.

If the TMDLs are vacated, the applicable criteria will remain on the books, but all of these watershed-scale benefits embodied in the TMDLs will be lost. Permitting, funding and restoration activities may continue, but without the benefit of the comprehensive, systematic TMDL blueprint.

TFT's recent experience is illustrative of this threat. Over the course of this litigation, the continued viability and effect of the TMDLs has been called into question, thus preventing new programs predicated on those TMDLs from advancing. If the TMDLs are vacated, the lack of further on-the-ground progress will only be exacerbated. Whitworth Decl., ¶ 21.

II.     The TMDLs should be remanded to EPA without qualification.

In its brief, NWEA argues for a series of mandatory injunctions directing EPA to take specific actions within prescribed time frames on remand, including reviewing the numeric calculations of the NCC that had been used in the TMDLs as "new criteria" under Section 303(c) of the Clean Water Act within 90 days of final judgment, and subjecting those new criteria to consultation under Section 7 of the Endangered Species Act within this same 90-day period. Plaintiff's Opening Brief on Remedies, ECF No. 158, at 17. But as EPA explains it its brief, these mandatory injunctions make little sense for numeric calculations derived using criteria that are void *ab initio* and, in any event, were never intended to constitute "new

criteria." EPA's Brief in Opposition to Plaintiff's Motion for Summary Judgment on Remedy, ECF No. 162, at 4.

On remand, DEQ and EPA will need to determine whether to (1) establish new BBNC-based TMDLs or, alternatively (2) revisit the "applicable" criteria for these purposes, determine whether new or revised criteria are needed, and then go through the full-blown processes under Section 303(c) of the Clean Water Act and Section 7 of the Endangered Species Act for any new or revised criteria before establishing new TMDLs. Neither remand option available to the agencies involves the perpetuation or use of the numeric calculations of the NCC that had been used in the TMDLs. Thus, there will be no benefit to any of the parties, the public, or the environment in pursuing the injunctions requested by NWEA.

The proper remedy is to remand the TMDLs without vacatur to give DEQ an opportunity to establish, and EPA an opportunity to approve, replacement TMDLs. Getting these TMDLs right on remand will take time. Without expressing any position on the schedule proposed by EPA, TFT notes that either option on remand (replacing the TMDLs using BBNC or replacing them using other new or revised criteria) will require significant new data collection, analyses and stakeholder involvement. At least some of the information underlying the existing TMDLs is now dated and must be refreshed. Watershed conditions have changed, and regardless of whether those changes are for the worse or better, they must be evaluated and factored into the TMDL analysis. The agencies also now have a body of evidence on implementation practices, successes and failures that necessarily must be fed into

the replacement TMDLs for purposes of ensuring that those TMDLs are truly "implementation-ready."

Rushing any step in this process will impair what TFT believes to be the shared goal of all parties to this litigation – durable, quantifiable water quality improvement based on the best available science and legally defensible criteria and TMDLs.  Any injunction directing the agencies to take specific actions within prescribed time frames on remand would interfere with their expertise and judgment.  For these reasons, TFT joins EPA in seeking remand without prescriptive injunctive actions or deadlines.

## CONCLUSION

TFT respectfully requests that this Court deny NWEA's motion for vacatur and for issuance of a mandatory injunction, enter a declaratory judgment consistent with this Court's Order dated April 11, 2017 (ECF No. 149), and remand the TMDLs to the agencies to be replaced.

DATED: March 16, 2018.

TROUTMAN SANDERS LLP


*s/ Brooks M. Smith*

BROOKS M. SMITH, *admitted pro hac vice*
1001 Haxall Point
P.O. Box 1122 (23218)
Richmond, VA 23219
Telephone: (804) 697-1414
Email: brooks.smith@troutmansanders.com

JASMINE C. HITES, OSB# 104056

Page 14 – TFT'S BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON REMEDY

>Troutman Sanders, LLP
>100 SW Main St., Suite 1000
>Portland, OR 97204
>Telephone: (503) 290-2344
>Email: jasmine.hites@troutmansanders.com
>
>JOSEPH A. FURIA, OSB # 083282
>Landye Bennett Blumstein LLP
>1300 SW 5th Avenue, Suite 3600
>Portland, OR 97201
>Telephone: (503) 224-4100
>Email: jfuria@lbblawyers.com
>
>Attorneys for The Freshwater Trust

Page 15 – TFT'S BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON REMEDY

## CERTIFICATE OF SERVICE

I hereby certify that on March 16, 2018, I electronically filed the foregoing document with the Clerk of the Court for the United States District Court of Oregon by using the CM/ECF system. Participants in this case No. 3:12-cv-01751-AC who are registered CM/ECF users will be served by the CM/ECF system.

s/ *Jasmine C. Hites*

Jasmine C. Hites