ELLEN F. ROSENBLUM
Attorney General
FRANK HAMMOND  #852239
SCOTT KAPLAN  #913350
Senior Assistant Attorneys General
Department of Justice
100 SW Market Street
Portland, OR  97201
Telephone:  (971) 673-1880
Fax:  (971) 673-5000
Email:  Frank.Hammond@doj.state.or.us
Email:  scott.kaplan@doj.state.or.us

      Attorneys for State of Oregon

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| NORTHWEST ENVIRONMENTAL ADVOCATES, a non-profit corporation,<br><br>     Plaintiff,<br><br>v.<br><br>UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, a United States Government Agency,<br><br>     Defendant,<br><br>v.<br><br>STATE OF OREGON, OREGON WATER QUALITY STANDARDS GROUP, and FRESH WATER TRUST<br><br>     Intervenor-Defendants | Case No. 3:12-cv-01751-AC<br><br><br>STATE OF OREGON'S RESPONSE TO PLAINTIFF'S OPENING BRIEF ON REMEDIES |

Page 1 -   STATE OF OREGON'S RESPONSE TO PLAINTIFF'S OPENING BRIEF ON
            REMEDIES
        FH/cre/8777447-v1

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4792

## I.    INTRODUCTION

The Court should not vacate the challenged temperature TMDLs of Intervenor-Defendant State of Oregon (the "State") pending issuance and approval of new temperature TMDLs. Although the Court has held that defendant EPA should not have approved the subject TMDLs, the Court in its equitable power should not vacate them.  Instead, they should be left in place until the State and EPA complete the process of drafting and issuing a replacement TMDL for each water body at issue in this case.

Leaving the TMDLs in place until replacements are developed will help preserve and improve Oregon's water quality.  TMDLs serve as a link in the regulatory chain contemplated by the Clean Water Act ("CWA").  As explained by the Ninth Circuit, "TMDLs are primarily informational tools that allow the states to proceed from the identification of waters requiring additional planning to the required plans."  *Pronsolino v. Nastri*, 291 F.3d 1123, 1129 (9th Cir. 2002), *cert. denied*, 539 U.S. 926 (2003), *citing Alaska Center for the Environment v. Browner,* 20 F.3d 981, 984–85 (9th Cir.1994).  Indeed, "TMDLs serve as a link in an implementation chain that includes federally-regulated point source controls, state or local plans for point and nonpoint source pollution reduction, and assessment of the impact of such measures on water quality, all to the end of attaining water quality goals for the nation's waters." *Id.*

Vacating the TMDLs would remove this link in Oregon's water quality regulatory program, and thus have negative effects on water quality.  Vacature of the TMDLs would impact DEQ's ability to regulate both point and non-point sources of pollution.[1] As to point sources, the absence of a TMDL introduces uncertainty and adds complexity to the permit development process, which could result in more time consuming and resource-intensive efforts for DEQ and

---

[1] Oregon statute defines point and nonpoint sources of water pollution, and the Environmental Quality Commission (EQC) has also defined the terms by rule. ORS 468B.005; OAR 340-041-0002(42). The state definitions track the federal definitions under the Clean Water Act.

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4792

for the permittee. Additionally, as will be explained further, NPDES permits for certain point sources would become *less protective*, contrary to the goals of the CWA, DEQ, and, presumably, NWEA. Non-point source pollution reduction plans and programs developed over many years to implement the TMDLs would be erased through vacature of the TMDL. Water quality and the environment would suffer as a result.

The State understands that under the Court's order the TMDLs have to be replaced. This could require promulgation of a new water quality standard, but at the least would require up-to-date data and monitoring. As explained in DEQ manager Eugene Foster's first declaration (ECF No.166), to properly complete this complex process would likely take 12 years. Therefore, the Court should exercise its equitable powers not to vacate the existing TMDLs until the time that each TMDL is replaced, protecting Oregon's water quality during the time it takes to engage in the complex regulatory and scientific process of promulgating new TMDLs.

## II.    ARGUMENT

### A.    The Court is not required to vacate the TMDLs, and in the exercise of its equitable powers it can allow the State and EPA time to issue new temperature TMDLs.

As detailed in EPA's brief, the Court is not required to vacate the TMDLs. EPA's Brief In Opposition To Plaintiff's Motion for Summary Judgement on Remedy ("EPA Response;" ECF No. 162 at 9-10).[2] Nor is vacature presumed to be the remedy. Id. In deciding whether to vacate the TMDLs the Court must consider the disruption that such a remedy would create and the potential damage to the environment. (EPA Response at 16.) Here, vacating the TMDLs would cause significant disruption and harm the environment. Under the current circumstances, the Court should exercise its equitable powers not to vacate the TMDLs.

---

[2] EPA's brief also responds to NWEA's requests for a mandatory injunction. EPA Response at 19-25. The State adopts EPA's position on the issue of whether a mandatory injunction should issue.

Page 3 -    STATE OF OREGON'S RESPONSE TO PLAINTIFF'S OPENING BRIEF ON REMEDIES
FH/cre/8777447-v1

**B.    Vacating the TMDLs would leave a void in DEQ's program, damaging its efforts to achieve better water quality.**

**1.    The temperature TMDLs are important to DEQ's regulatory program.  Vacating them would remove an essential link in that program, particularly impacting DEQ's ability to limit non-point source pollution.**

Section 319 of the Clean Water Act requires states to prepare and implement a nonpoint source management plan that controls on nonpoint sources to the maximum extent practicable.[3] Aside from that plan, the primary mechanism for regulating nonpoint source pollution in Oregon is through DEQ's issuance of TMDLs and their related implementation plans.[4]  To develop TMDLs, DEQ's water quality analysts and basin coordinators, with input from a local stakeholder advisory committee, determine load capacity, waste load and load allocations, and other elements required by OAR Chapter 340, Division 42.  During the process, DEQ also develops a water quality management plan (WQMP), which provides the accompanying framework to guide the detailed implementation plans and analysis required to be developed by sectors (e.g, county) to address nonpoint source pollution.  Designated management agencies (DMAs), which are government agencies with legal authority over a source or sector contributing pollutants[5], take the information provided in the TMDLs to do additional, more detailed analysis in order to implement the TMDLs.  It is the existence of the TMDL that prompts this action by DMAs.[6] Vacating the TMDLs would also vacate these accompanying WQMPs and any further implementation plans developed by DMAs that rely on the TMDLs. The disappearance of these plans would have the "on the ground" effect of removing protections to benefit water quality around the state.  One specific example of a local protection that is based

---

[3] 33 USC § 1329.

[4] OAR chapter 340, division 42.

[5] OAR 340-042-0030(2).

[6] For example state law provides that the Oregon Department of Agriculture can determine agriculture and rural lands that are subject to a water quality management plan after DEQ establishes a TMDL.  See ORS 568.909(a).

Page 4 -    STATE OF OREGON'S RESPONSE TO PLAINTIFF'S OPENING BRIEF ON
        REMEDIES
        FH/cre/8777447-v1

on one of the TMDLs at issue in this case is the Benton County example provided Dr. Foster's

Second Declaration in paragraph 5.  However, there are numerous similar examples around the

state.  *Id.*

> **2.    Without the TMDLs some point sources could have higher effluent limits, resulting in increased permitted loads to waters now covered by the TMDLs.**

Since the Natural Conditions Criteria was held by the Court to be invalid, DEQ has been

employing an approach to permitting that applies the *stricter* of the Biologically Based Numeric

Criteria or the existing waste load allocation in the TMDL.[7]  DEQ's policy provides as follows:

> For permit renewals, permit writers will determine the thermal loads that are consistent with TMDL waste load allocations and compare it to the thermal loads based on BBNC with the human use allowance of 0.3°C (see OAR 340-041-0028(12)(b)(A)). The more stringent of the two loads must be addressed in the permit. The permit evaluation report should clearly describe how the temperature limits were developed.

WQ Permitting Policy, No. WQP 007, subpart D, 2017.[8]  However, if the TMDLs are vacated

DEQ could no longer apply this approach because any applicable waste load allocations would

no longer exist.  With no TMDL in place, DEQ could only apply the BBNC until a new standard

or waste load allocation was developed.  This would result in a period where for some facilities

the resultant permit requirements would be *less protective* than the waste load that would have

resulted if the TMDLs were kept in place.  Keeping the TMDLs in place while replacement

TMDLs are developed would in some cases result in stricter limits for NPDES permittees and

would never result in a weaker limit being applied.

---

[7] EPA has discussed the Human Use Allowance in its brief, and how DEQ will allocate it to anthropogenic sources.  To provide further explanation, in permitting, if the standard is the BBNC the permit discharge temperature will be based on the BBNC plus the HUA.  If, however, that number is higher than what is called for in the waste load allocation under the existing TMDL and water quality management plan, the lower number will be used for permitting.

[8] http://www.oregon.gov/deq/wq/wqpermits/Pages/NPDES-Individual-Permit-Templates.aspx

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4792

**3.    To avoid these harms, the Court should delay vacating the TMDLs to allow development of replacements.**

The potential harms described above and in Dr. Foster's Second Declaration are significant.  For this reason, the Court should allow the existing TMDLs to stay in place until replacements can be developed.

**C.    Taking the proper steps to replace the TMDLs at issue in this case will take many years and it is reasonable to leave the TMDLs in place while DEQ and EPA complete that significant effort.**

Dr. Foster explained in his First Declaration that it will take 12 years to prepare and adopt new temperature TMDLs.  This schedule provides that each new TMDL will take three years to develop according to the process required by the division 42 rules.  (ECF No. 166). Also, Dr. Foster stated that this will occur only if EPA and the Oregon Legislature devote additional resources to TMDL development.  (*Id.*)   Considering the effort required and described in Dr. Foster's First Declaration, allowing 12 years for TMDL replacement is reasonable.  Considering that significant time period, the current TMDLs will be beneficial to the environment during that time.

**D.    The current TMDLs provide greater environmental benefit in non-point source protections than any quickly developed replacement TMDLs could provide.**

NWEA asserts that the court must vacate the TMDLs, order EPA to disapprove the TMDLs on remand and then establish replacement TMDLs within 30 days.  Plaintiff's Opening Brief on Remedies pp. 26-28 (ECF No.158).  The description of the process required to develop effective TMDLs provided in Dr. Foster's First Declaration explains why this timeline is not possible given the scope of the TMDLs at issue in this case, and the process involved in effective TMDL development.  Additionally, it is important to consider that while the TMDLs at issue in this case were developed over many years, the WQMPs and IPs described above also took many additional years to complete.  Any quickly ordered replacement TMDLs would not have the level of analysis and accompanying detail needed for effectively implementing the TMDLs.  For this reason, the existing TMDLs provide greater environmental benefit than any hastily

Page 6 -    STATE OF OREGON'S RESPONSE TO PLAINTIFF'S OPENING BRIEF ON REMEDIES

FH/cre/8777447-v1

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4792

developed replacement TMDLs could contain.  Any schedule ordered for TMDL replacement should allow sufficient time for effective replacement and the existing TMDLs should be kept in place while replacement TMDLs are developed.

## III.    CONCLUSION

The current temperature TMDLs serve as an important link in the water quality regulatory chain and provide benefits for water quality.  For the reasons outlined above, the existing TMDLs should be left in place while replacement TMDLs are promulgated.[9]

DATED March  16 , 2018.

Respectfully submitted,

ELLEN F. ROSENBLUM
Attorney General


_s/ Frank Hammond_
FRANK HAMMOND  #852239
SCOTT KAPLAN  #913350
Senior Assistant Attorneys General
Department of Justice
100 SW Market Street
Portland, OR  97201
Telephone:  (971) 673-1880
Fax:  (971) 673-5000
Frank.Hammond@doj.state.or.us
scott.kaplan@doj.state.or.us
Of Attorneys for State of Oregon

---

[9] Subject to the arguments and qualifications of the State in this brief and the accompanying Second Declaration of Eugene Foster, the State adopts the brief and supporting declarations of EPA in its first submission on remedies as if they were its own.

Page 7 -    STATE OF OREGON'S RESPONSE TO PLAINTIFF'S OPENING BRIEF ON
REMEDIES
FH/cre/8777447-v1

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4792